(Decided 6th March, 1879.)

THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.*
ELI STRICKER.

*Action for Personal Injuries—Negligence—Reasonable Prudence and Caution—Reasonable care on the part of a Railroad Company—Risks assumed by Employés—Erroneous Instructions.*

To entitle the plaintiff in an action against a railroad company, to recover damages for injuries sustained by him, by being carried against the strut of a bridge spanning the defendant's road, while in the discharge of his duty as conductor of a freight train then in motion he was walking on top of a house car, it is necessary to prove that the company has been guilty of negligence which directly caused the injury, that is to say, that in the relation which existed between the plaintiff and the company, the latter has failed or neglected to perform some duty towards the plaintiff, which was devolved upon it by law ; and secondly, it must appear that the plaintiff was not guilty of any negligence on his part, or any want of reasonable prudence and caution to avoid the accident.

It is the duty of a railroad company to exercise all reasonable care to provide and maintain safe, sound and suitable machinery, roadway structures and instrumentalities, and it must not expose its employés to risks beyond those which are incident to the employment, and were in contemplation at the time of the contract of service; and the employé has a right to presume that the company has discharged these duties.

A prayer which in general terms submitted to the jury the question of reasonable care on the part of the railroad company in constructing a bridge with a view to the safety of its employés, and also whether or not the plaintiff (an employé who had been injured while in the discharge of his duty, by being carried against the bridge,) had used ordinary care under the circumstances to avoid the accident, is erroneous, as it ignores the distinction between an employé having knowledge of the business and one having no knowledge. The plaintiff must be held to have understood the ordinary hazards attending his employment, and, therefore, to have voluntarily taken upon himself the hazards, when he entered, or when, with that knowledge, he chose to continue in the service of the company. There being no evidence of negligence on the part of the railroad company it was error to submit that question to the jury.

APPEAL from the Circuit Court of Frederick County.

The facts of this case (which was removed from the Baltimore City Court on the suggestion and affidavit of the defendant) are stated in the opinion of the Court.

*Exceptions.*—At the trial the plaintiff offered the following prayers:

1. That if the jury find from the evidence that the defendant is a corporation owning and operating a railroad as set forth in the declaration, and was at the time of the alleged injuries complained of, and that the plaintiff entered the service of defendant in 1867, as freight brakeman on the first division of defendant's road, and so continued until July, 1869, and then became a freight conductor on the same division, in the same service, and so continued and so was at the time he received the injuries testified to, if they should find such injuries, and that his duties in each position required him at times to be on

top of house cars, and that at the time plaintiff so engaged defendant's service, there was a bridge known as the "Bull Eye" bridge, built by defendant over and across its road-bed on said division, and that said bridge was so constructed as that all of defendant's employés, who had occasion to pass thereunder in the discharge of their duties, on the tops of such cars as defendant then used upon its road, could so pass thereunder with safety; and shall further find that after plaintiff had so entered defendant's service, the defendant introduced and used upon its said road, and on said division, both through connections formed with other roads and by its own manufacture thereof, another and a higher kind of house cars than defendant had previously had in use upon its road, and continued year by year so to use, and to increase the number of such higher cars upon its road, and on said division, until in 1872, and after, and that during the year 1872, the defendant had in use on its said road and division a large number of said higher cars, and was then manufacturing the same at its own works for use on its said road at the rate of about 100 per year; and that during the year 1872, the defendant took down the bridge known as the "Bull Eye" bridge, which was standing at the time plaintiff entered defendant's service, and erected over and across its road-bed at the same point, and in lieu of said former bridge, another bridge, and that defendant in the construction, plan and elevations of said bridge of 1872, did not use ordinary and reasonable care, having a due regard to the safety of such of its employés as were required in the discharge of their duties to pass on the tops of such higher cars under the said bridge of 1872, and that the defendant when it built said bridge knew that the same was not a safe and suitable bridge, so far as the safety of such of its said employés was concerned; and should further find that the plaintiff, while in the discharge of his duties as such freight conductor, upon the

top of one of said higher cars, was, on June 6th, 1879, struck by a strut of said bridge and injured, then the plaintiff is entitled to recover, if the jury further find that when he was so struck, he was using ordinary and reasonable care under the circumstances, and did not know that said strut was too low to allow him to pass under said bridge, standing on top of such higher car, with safety, unless they find that the insufficient height of said strut was plainly and obviously apparent, and that the burden of proving such knowledge on the part of plaintiff, or of proving that the height of said strut, was plainly and obviously insufficient, is on the defendant.

2. That if the jury find for the plaintiff under his first prayer, they are, in estimating the damages, at liberty to consider the health and condition of the plaintiff before the injuries complained of, as compared with his present condition, in consequence of said injuries, and whether the said injuries are in their nature permanent, and how far they are calculated to disable the plaintiff from engaging in those pursuits and employments for which, in the absence of said injuries, he would have been qualified, and also the physical and mental suffering to which he was subjected by reason of said injuries, and to allow such damages as in the opinion of the jury will be a fair and just compensation for the injuries which the plaintiff has sustained.

The defendant offered the following prayers:

1. That if the jury shall find the defendant is a corporation, owning and operating a railroad, as charged in plaintiff's declaration, and that in the year 1858, they erected a wagon road bridge over said railroad, near Martinsburg, West Virginia, and that said bridge was too low for a man standing erect on house cars, then in use, to pass thereunder in safety, and that while said bridge was in existence, the plaintiff, in the year 1867, entered the employment of defendant, as brakeman on freight trains, and continued so for nineteen months, and was

then promoted to be a conductor of freight trains, and that the plaintiff knew said bridge was too low to pass thereunder in safety, on the top of house cars, in use on defendant's road; and shall also find that in the month of May, 1872, said defendant tore down said bridge and erected a new bridge, and that said new bridge was higher than the old one, but not sufficiently high to permit a man standing erect on house cars, in general use on defendant's road, to pass thereunder with safety, then the risks assumed by plaintiff, when he entered the service of defendant, were not increased by the erection of said new bridge.

2. That if the jury shall find the facts stated in the first prayer, and that the plaintiff continued in the service of the defendant as a conductor as aforesaid, and that in the course of his employment he passed and repassed under said bridge almost daily in going over the first division of defendant's road, extending from Baltimore to Martinsburg, West Virginia, from the time said bridge was built in May, 1872, to the time of the happening of the accident to plaintiff, on June 6th, 1876, and with house cars in general use on defendant's road; and shall further find that said bridge was a permanent structure, visible to the observation of all, and that plaintiff was acquainted with the location, situation, appearance and all the surroundings of said bridge, then [the jury may infer] that the plaintiff had equal opportunity as the defendant of knowing that said bridge was too low to permit a man standing erect on top of house cars in general use on defendant's road, to pass with safety under said bridge.

3. That if the jury shall find the facts in the foregoing prayers of defendant, and shall also find that the plaintiff, on the morning of June 6th, 1876, as conductor aforesaid, had charge of the fifth section of train No. 35, going east, and that said train consisted of eighteen gondola cars, four coal hoppers, one house car and a caboose, and that

plaintiff with said train was ready to start at 6 A. M., (with said train,) to go over said first division, and ran into a siding on said road off of main track, a short distance west of said bridge, to wait till a passenger train, known as No. 27, had passed down said road, and that after the passage of said train, the train of cars of which plaintiff was conductor, came out of said siding on the main track of defendant's road, and that the brakeman on plaintiff's train let down the switch balls to permit said train to run on said main track, and the plaintiff remained on said train and applied the brakes, and that after said brakeman had locked the switches, and had got upon said train, said plaintiff gave the engineman the signal to go ahead, and that thereupon said train started, and said plaintiff commenced letting up brakes six or seven cars from the rear end of said train, and so continued to let up said brakes until he reached said house car next to the caboose car, and had climbed up on top of said house car for the purpose of letting up the brake of said car and going to the caboose car, and had just reached a standing position on said car, with his back to said bridge, when the back part of his head came in contact with the strut of said bridge, knocking him off of said car and injuring him; and shall further find, that at the time of the happening of the accident of plaintiff, he was in the discharge of his duty, and that he had never made objections to any of the officers of said defendant to the lowness of said bridge, or to the cars then in general use on defendant's road; and shall also find that plaintiff had equal opportunity as defendant of knowing that said bridge was too low to permit a man, standing or walking on the top of house cars in general use on defendant's road at the time of the happening of the accident to plaintiff, to pass thereunder in safety, then that the plaintiff is not entitled to recover in this action, damages for injuries sustained by reason of the lowness of said bridge, and their verdict must be for the defendant.

4. If the jury find that at the time and place, when and where the injury complained of happened, the plaintiff was conductor of a freight train in the employ of the defendant, and that the bridge mentioned in the declaration was too low to permit the plaintiff to pass, without injury or harm, under it, standing or walking on the tops of one of the house cars in his train, and that the plaintiff was then and there discharging his duty as conductor, but further find that the bridge had been of the same height for two, three or four years before the accident, during which time the plaintiff had frequently, in charge of his trains, passed under it; and further find that the bridge was visible, obvious and apparent, and that the plaintiff knew where it was; and further find that it was dangerous to pass under it standing or walking on the top of a house car, and that to a person of ordinary intelligence and observation, in the plaintiff's position, the danger of passing under it as aforesaid was apparent, then the plaintiff cannot recover, even though the jury may believe that he did not, in fact, know that it was dangerous to pass under the bridge.

5. And if the jury find the facts set out in the foregoing prayer, as to the situation of the bridge, the employment of the plaintiff, and his knowledge of the situation of the bridge, and they believe that the plaintiff did not know that the bridge was too low to allow him to pass under it without being injured whilst standing or walking on the top of a house car, but further find, that by the exercise of ordinary intelligence, judgment and observation, the plaintiff might have known that the bridge was too low to allow him to pass as aforesaid, then the plaintiff cannot recover.

6. And if the jury find that the plaintiff, at the time and place where the injury complained of happened, was a freight conductor in the service of the defendant, and was in charge of his train and in discharge of his duty,

and also, that the bridge was too low to allow him to pass safely under it standing or walking on the top of a house car, yet the plaintiff cannot recover, if they further find, that at any time before the accident occurred, the plaintiff had knowledge that the bridge was too low to allow him to pass under it, standing or walking on the top of a house car; and in determining the question of knowledge on part of the plaintiff, as to the danger in passing under the bridge, the jury are to consider, [together with other testimony in the case,] the length of time the plaintiff was in said service, the number of times he must have passed under the bridge, the manner in which he governed himself on previous occasions, as he approached and passed under it, the visible and obvious appearance of the bridge, and the experience, age and intelligence of the plaintiff.

7. If the jury find that the plaintiff had been in the service of defendant continuously four years prior to the time of the happening of the accident, and had been passing under said bridge during all that time almost daily, and knew the position of the bridge, and that the bridge was visible and apparent, and that the plaintiff in passing under it previous to the accident, had frequently stooped down or dodged the bridge to prevent it from striking him, then [the jury may infer] that the plaintiff is chargeable with actual knowledge that the bridge was too low for him to pass thereunder on top of a house car on the train while in motion, standing erect.

8. That the defendant was under no obligation to construct the bridge mentioned in plaintiff's declaration and by the witness, of a height sufficient to allow its employés, in the discharge of their duties in running freight trains over its road, to stand erect or walk on top of house cars in a train in motion to pass thereunder, and that if the plaintiff was injured by reason of the lowness of said bridge while standing erect or walking on top of a house car in a train in motion, then he cannot recover in this action, and their verdict must be for the defendant.

9. That the only obligation upon the defendant to its employés engaged in running trains over said road, in the erection and construction of said bridge, was to erect and construct it of such a height, that the employés of said defendant, in the discharge of their duties, could pass under said bridge in safety by the use of ordinary care and prudence; and that the plaintiff has offered no evidence to the jury that said bridge was so negligently constructed, that said employes could not pass thereunder in safety in the discharge of their duties, by the use of ordinary care and prudence on their part.

10. That the defendant was under no obligation to construct the bridge mentioned in the declaration, of a height sufficient to allow the plaintiff, as an employé in charge of a freight train, to pass under it on the top of a house car without stooping or sitting down on the car, so as to avoid the bridge; and that when the plaintiff went into the service of the defendant, as alleged in his declaration, he assumed not only the usual risks incident to the service he engaged in, but also such other risks as were visible and apparent; and therefore if the jury find, that at the time and place, when and where the injury complained of, the plaintiff was a conductor of a freight train, in the employment of the defendant, and that the injury was occasioned by being carried against the said bridge whilst in the discharge of his duty, standing or walking on the top of a house car passing under it; and further find, that the place where the bridge stood was known to the plaintiff, and that the bridge itself was a permanent structure, and had been there for three or four years before the injury, and whilst the plaintiff was such conductor, and that it was plainly visible and apparent, then the plaintiff cannot recover in this cause; provided the jury find that by sitting down, or by stooping, the plaintiff could have avoided the injury.

11. That the defendant was not bound so to build and maintain the bridge mentioned in the plaintiff's declara-

tion, of such a height as that the plaintiff, being in the defendant's employment, and discharging his duty, could pass under it without injury standing or walking on the top of a house car; and if the jury find that the plaintiff was injured, as mentioned in his declaration, by reason of the lowness of the bridge, as he was discharging his duty, being a conductor of a freight train, and that he did not know that the bridge was too low, but further find that the place where the bridge stood was well known to the plaintiff, and that the bridge itself was plainly visible and apparent, then it is incumbent on the plaintiff, in order to entitle him to recover, to satisfy the jury that the injury complained of could not have been avoided by the exercise of ordinary care and precaution on his part.

12. That the defendant was guilty of no neglect or omission of duty towards its employés engaged on cars and trains running on its road, in building the bridge mentioned in the plaintiff's declaration so low that its employés could not pass under it with safety on the top of house cars, unless in a stooping or sitting position. And if the jury find that before the injury complained of, the plaintiff had accepted service with the defendant, as conductor of one of its freight trains, and that his duty as such conductor required him to pass under the bridge on the top of house cars, and that at the time he was injured he was standing or walking on the top of a house car, which was passing under the bridge, whereby he was carried against the bridge and injured; but further find that he knew where the bridge stood, and that he had frequently seen it before he was injured, and had frequently passed under it, and the bridge itself was visible, obvious and apparent, and that by stooping down, or sitting down on the top of the house car, he would have escaped the injury, the plaintiff cannot recover.

13. That if the jury shall find that the plaintiff was in the employ of defendant as conductor of freight trains,

and that he knew the situation, location and all surroundings of said bridge, and that while standing erect on top of a house car, in the discharge of his duties as such, he had his back to said bridge and forgot how near he was to said bridge, and while he was in this position he was carried against said bridge, and his head came in contact with the strut of said bridge, and he was thrown off of said car and injured; and shall further find that the plaintiff, for four years previous to the time of the happening of said accident, had passed under said bridge almost daily, in the course of his employment, with cars, in general use on defendant's road, without receiving injury; and shall also find that the said passage under said bridge was sufficient to permit the plaintiff, riding on top of a house car in a train in motion, in a sitting or stooping position, to pass under said bridge in safety; and shall further find that the plaintiff failed to use, at the time of the accident, producing the injury complained of, such necessary precaution to prevent injury to himself, then [the jury may infer] that the plaintiff was guilty of the want of ordinary care and prudence, which directly contributed to the accident producing the injury, and he cannot recover in this action; even though the jury may find that the defendant was guilty of negligence in the erection of said bridge, the height of which, from railroad track to the strut of said bridge, was not sufficient to permit a man of the height of the plaintiff to stand erect on top of house cars, in general use on defendant's road, to pass thereunder in safety.

14. That if the jury shall find that the plaintiff was in the employ of defendant, as conductor of freight trains, and that he knew the situation, location and surroundings of said bridge, and that while standing erect on top of a house car in the discharge of his duties as such, he had his back to said bridge and forgot how near he was to said bridge, and while he was in this position he was car-

ried against said bridge, and struck in the back of his head by its coming in contact with the strut of said bridge, thrown off of said car and injured, then the act of the plaintiff in standing erect on said house car with his back to said bridge, was such a want of care and prudence on the part of said plaintiff, in the employment he was engaged in, as directly contributed to the accident causing the injury, and he cannot recover in this action.

15. If the jury shall find the employment and injury to the plaintiff as mentioned in plaintiff's declaration, and by the witnesses, and that the defendant in the erection and construction of said bridge, was guilty of negligence, yet the burden of proof is on the plaintiff to show that the accident causing the injury could not have been avoided by the exercise of ordinary care and prudence on the part of the plaintiff; and further to instruct the jury, that the plaintiff has offered no proof of ordinary care and prudence on his part, and their verdict must be for the defendant.

The Court (LYNCH and BOUIC, J.) granted the plaintiff's prayers, and granted the defendant's first, third, fourth and fifth prayers, and granted his second, sixth, seventh and thirteenth prayers, as amended, by the parts contained in brackets, and rejected his eighth, ninth, tenth, eleventh, twelfth, fourteenth and fifteenth prayers.

Both sides excepted. The jury rendered a verdict for the plaintiff for $5000, and judgment was entered accordingly. The defendant appealed.

The cause was argued before BARTOL, C. J., BOWIE, BRENT, MILLER and ALVEY, J.

*John K. Cowen* and *A. H. Syester,* for the appellant.

What is the legal effect in a case like this, of the plain, undisputed facts, that the plaintiff actually knew that the old bridge erected prior to 1872, was too low to permit a

man to stand on top of a new house car passing thereunder; that the new bridge erected in 1872, was an open, notorious and permanent structure, plainly visible; and the further fact, that the appellee for nine years knew that a bridge was there, and on all occasions passed it safely, by stooping down to avoid it?

The implied contract between master and servant is, that in accepting services, the latter contracts that he will assume all such risks, and encounter all such perils in the course of his employment, as arise from causes or sources that are open, visible, notorious and constant, and not concealed, latent or temporary. *Wharton on Negligence, secs.* 214, 217; *Wood's Master and Servant*, 698, 680; *Seymour vs. Maddox*, 16 *Ad. & Ell., (O. B.)* 326; (71 *Eng. Com. Law*, 326.)

And it is equally well settled, and a most important principle, more fully applicable to this case than most others, that where a servant has the same means with the master, of determining and estimating dangers and risks, arising either from defective machinery or dangerous works, and can see that there is risk and danger, he cannot recover on the ground of negligence in the master, especially where he makes no complaint.

Indeed, in almost every case of injury arising from dangerous works of any kind, the servant employed in and about such works has not only equal, but even greater opportunities of knowing the fact of danger, and estimating the character and extent of the risk arising therefrom.

And it was especially so in this case, where the risk was incident to an open, plain, visible and permanent structure, and to the height of cars, one of which the appellee saw every day of his life nine years, and the other he handled, used and rode on every day—all day long for nine years. These principles of law are plainly applicable to this case, and control it.

Whenever a plaintiff, in his own case, shows that he brought the injury on himself by his own want of atten-

tion, forgetfulness or carelessness, he should be non-suited. *Holden vs. Liverpool*, 3 *C. B.*, 1 ; *Holly vs. Boston Gas Co.*, 8 *Grey*, 123,

The appellant's ninth prayer was improperly rejected. The first part of that prayer put this plain and familiar proposition of law. That in the construction of that bridge the appellant discharged its whole duty to its employés when it was built of such a height as to enable them in discharging their duties, to pass safely under it, by the use of ordinary care and prudence. And then the Court was asked, in the second branch of the prayer, to take the case from the jury, by the declaration that the appellee had put in no evidence to show that the bridge was so. built, as that the employés could not safely pass under by the use of ordinary care and prudence, whilst discharging their duties. This the Court refused to do. And the simple question here is, whether there is in this record, any evidence to show, that by the use of ordinary care an employé, in charge of a train, *could not* pass safely under the bridge. The record abounds in evidence, that by the exercise of the most common and ordinary kind of care, the bridge could have been avoided.

We start out with the presumption, that all things were done with due care, to the safety of the employés by the master. *Hard vs. R. R. Co.*, 23 *Vt.*, 473 ; *Gibson vs. R. Co.*, 26 *Mo.*, 163, *cited at p.* 708, *note* 1, *of Wood on Master and Servant.*

If this bridge was so constructed, and lifted above the track, as to enable the employés passing under it to do so, in discharging their duties, by stooping down to avoid the bridge, is anything more required ? And especially is anything more required as to him, who was perfectly familiar with all the conditions of the bridge, and had such ample opportunities of knowing and judging for himself, what was required to ensure his own personal safety, and who for so long a period did make use of the simplest

and least burdensome expedient possible to avoid the risks. *Gibson vs. Erie R. R. Co.*, 63 *N. Y.*, 449, 452, (20 *Am. Rep.*, 522.)

"There is no legal obligation on the part of a railroad company, to build its bridges under public roads, with an elevation so great, that one of its employés, standing upright, on the top of a car, will not be endangered; and consequently, if an employé, while thus standing in the course of his business, be struck by one of such bridges, he cannot recover for such injury." *Baylor vs. Delaware, Lackawana & Western R. R. Co.*, 11 *Vroom*, 23; (*Am. Law Reg.*, Sept. 1878, 604;) So too in *Devitt vs. Pac. R. R. Co.*, 50 *Mo.*, 302; 3 *Am. R. R. Cases*, 534; *Dynen vs. Leach*, 26 *L. J.*, (*Exch.*) 222; *Ladd vs. New Bedford R. R. Co.*, 119 *Mass.*, 412; See also, *Seymour vs. Maddox*, 16 *Q. B.*; *Snow vs. Houston*, 8 *Allen*; 33 *Mich.*, 134; *Woodley vs. Metropolitan Railway Co.*, 46 *Law Journal*, 521, 524; *Hayden vs. Smithville Manufacturing Co.*, 29 *Conn.*, 548, 550; *J. B. & W. R. R. Co. vs. Flanigan*, 77 *Illinois*, 365; *Comes vs. New Bedford R. R. Co.*, 102 *Mass.*, 588, 596, 597; *S. C.*, 3 *Am. R.*, 511; *Sullivan vs. India Manufacturing Company*, 113 *Mass.*, 377, 378; *Davis vs. Detroit and Milwaukee R. R. Co.*, 20 *Mich.*, 126, 127; *Note* 5, 3 *Am. Reports*, 148; *Wonder vs. B. & O. R. R. Co.*, 32 *Md.*, 419.

*Albert Ritchie* and *John Ritchie*, for the appellee.

When an employé enters the service of a railroad company, he of course assumes all its ordinary risks; that is, risks necessarily incidental to the employment. If there are extraordinary risks to be run when he enters the service, and he knows of them, he assumes them also. *Wonder's Case*, 32 *Md.*, 411; *Woodward's*, 41 *Md.*, 268. Where there is known to be a deficient force, or machinery of a more dangerous character than is generally used for the same purposes, the deficient force and dangerous machinery are features of the peculiar service the employé

enters, just as the ordinary risks are the features of ordinary railroad employment, or as the special hazards of dealing in dynamite are features of the service. But whatever the risks undertaken, the master has no right to enhance them, nor is the employé required to anticipate a violation of duty on the master's part. He has a right to confine himself to his duties, and to presume that the master will provide for their safe performance within the terms of his employment. If, after having entered the service, any extraordinary perils beyond the natural risks of the employment, and not within the contemplation of the parties when the employment was accepted, are introduced, or intervene, and are knowingly maintained by the company, from considerations of convenience, economy, or what not, the company is liable, if any casualty result therefrom, except to such extent as the employé's knowledge of their existence may qualify its liability. Nothing less than positive knowledge, however, can qualify such liability. (42 *Wis.*, 583.) The servant is not required to anticipate the master's negligence.

Waiver, or acquiescence, can be based only on knowledge, and the employé is not charged with the exercise of any care in this respect, until he knows what the master has done. He cannot be required to look out for what he is under no obligation to anticipate. He must have become aware of the negligence of the master, before he is required to exercise due care to avoid it. *Geis' Case*, 31 *Md.*, 357; *Lewis' Case*, 38 *Md.*, 588.

The question of the employé's knowledge is for the jury. If he knew of the new danger, then, it is submitted, that he is not, as a matter of law, thereby precluded from recovery; but that such knowledge is simply one fact, which, with all the other circumstances, is to go to the jury, and they are to find upon all whether or not the employé exercised a proper degree of care. On this point there is a difference of authority, but the weight of it

sanctions the statement of the law as here made. *Clarke vs. Holmes*, 7 *H. & N.*, 943 ; *Moran's Case*, 44 *Md.*, 293 ; *Patterson vs. P. & C. R. R. Co.*, 76 *Pa.*, 389 ; *Snow vs. Housatonic R. R.*, 8 *Allen*, 441 ; *Laning vs. N. Y. Central*, 49 *N. Y.*, 521 ; *Holmes vs. M. & C. C.*, 39 *Md.*, 243 ; *Plank vs. R. R.*, 60 *N. Y.*, 607 ; *Wharton on Negligence, sec.* 219 ; 59 *Mo.*, 261 ; 65 *Mo.*, 514 ; 102 *Mass.*, 572 ; 13 *Pick.*, 94 ; 97 *Mass.*, 273.

It is the duty of a railroad company to exercise all reasonable care to provide and maintain safe, sound and suitable machinery, roadway structures and instrumentalities; and it must not expose its employés to risks beyond those which are natural and incident to the employment, and were in contemplation at the time of the contract of service; and the employé has a right to presume that the company has discharged its obligations. If, after having so constructed and equipped its road, the company fail so to maintain it, and know, or ought to know of such failure, it is responsible to its employés for any injury resulting therefrom, except to such extent as its responsibility may be qualified by the employé's knowledge. *O'Connell vs. B. & O. R. R.*, 20 *Md.* 212 ; *C. C. & I. Co. vs. Scally*, 27 *Md.*, 589 ; *Wonder vs. B. & O. R. R.*, 32 *Md.*, 411 ; *C. & P. R. R. Co. vs. State, use of Moran*, 44 *Md.*, 283 ; *Ill. R. R. Co. vs. Welch*, 52 *Ill.*, 183 ; *O'Donnell vs. Allegany V. R. R.*, 59 *Pa.*, 239 ; *Chicago & N. W. R. R. vs. Swett*, 45 *Ill.*, 197 ; *Snow vs. Housatonic R. R.*, 8 *Allen*, 441 ; *Ford vs. Fitchburg R. R.*, 110 *Mass.*, 240 ; *Lewis vs. St. L. R. R.*, 59 *Mo.*, 495 ; *Paulmier, Adm'r vs. Erie R. R. Co.*, 5 *Vroom*, 151, (34 *N. J. L.;) Dorsey vs. The Phillips & C. C. Co.*, 42 *Wisconsin*, 583.

BARTOL, C. J., delivered the opinion of the Court.

This suit was brought by the appellee to recover for injuries received by being carried against a bridge, spanning the appellant's road, while he was on top of a "house

car," in the discharge of his duty as conductor of a freight train.

The accident happened on the 6th day of June 1876, in passing under the bridge, called "*Bull Eye Bridge*," which was built by the appellant, on a public road about three-fourths of a mile east of Martinsburg.

It appears from the evidence, that the appellee entered the service of the company in 1867, as *brakeman* on freight trains between Martinsburg and Baltimore. In July 1869, he was promoted to be a *conductor* of freight trains on the same section of the road, and continued in that employment till the time of the accident. In that capacity it was his duty to assist at the brakes.

When the appellee first went upon the road, the house cars of the company were from *nine to ten feet* high; about the year 1869, connection with western roads began to be formed, and higher cars were introduced from the West, the company also began to construct *new cars*, which were *ten feet ten inches, to eleven feet* high, and the western cars, sometimes used, were eleven and a half feet high. The plaintiff testifies that some of the *new cars* were on the road while he was brakeman; the number of these was increased, and they were in general use after 1872 or 1873. They were constructed with the brakes on top, and to manage the brakes, it was necessary to be on the top of the car.

In 1872, the old "Bull Eye" bridge was removed, and a new bridge built, which was of different construction, and of about the same height as the old one, that is to say *seventeen feet, four inches* high, measuring from the railway to the *struts* or lowermost timbers of the bridge.

On the 6th of June 1876, the appellee, having in charge a freight train, consisting of twenty-three loaded cars, viz., eighteen gondolas, four hoppers and one of the *new* house cars, and also the caboose, was ready to start from Martinsburg at 6 o'clock in the morning. In order to leave the track

clear for an expected passenger train, as was his duty, he took his train upon a siding, or switch, between Martinsburg and the bridge, where he remained till half past 6, when he brought his train on the main track and proceeded on his way. The distance from the bridge to the switch was 200 to 300 yards, from which place the bridge was in full view.

The accident happened in this way; the appellee was assisted by one brakeman, who remained behind to lock the switch; the appellee being specially charged to see that this important duty was performed, held the train waiting till it was done. He was standing on the 6th or 7th car from the rear of the train, looking back to see the brakeman lock the switch, and for his signal, when he saw this, he immediately signalled the engineer to go on, and began to *let* off the brakes, had let off the brakes as far back as the house car, which was the last car except the caboose, had got on top of it about the centre, and was walking toward the brake, for the purpose of letting it off, and then going into the caboose, when he was struck by the *strut* of the bridge, his back being then turned towards it.

The appellee testified that he had never heard of any one having been struck by this bridge, before he was struck, that no one on the part of the company had ever told or notified him that this bridge was too low, that he did not know its exact height, but supposed that the struts were high enough to clear a man standing on top of such a car as he had. Had never before had occasion to be adjusting the brakes, or to be walking on top of a car as he was passing under that bridge. Had been on the siding often before, but had never started from it on his trip, had always started from the station, and that gave him ample time to have the brakes adjusted before he got to the bridge.

Proof was given that it was known to Mr. Wilson, the the company's master of road, that the "Bull Eye" bridge was not high enough to allow a man to pass under it standing on top of the new house cars; and further that there were no signal ropes to warn persons approaching the bridge, such as were used at some of the other bridges.

On the other hand, a number of witnesses, examined by the defendant, conductors, brakemen, and engineers, employed on the same section of the road, testified that this bridge was too low to allow a tall man to pass under it, standing upon a house car, that this fact was plainly visible and obvious to any one passing under it, and that it was the habit of brakemen and conductors, when on top of a house car, to stoop or remain seated while passing under the bridge. Two of them *Bierman* the engineer, and *Dixon* the brakeman, were on the same train with the appellee when he was struck, both testify that they had often seen him stoop down when passing under the same bridge. And the appellee himself stated in his testimony, that he was down on the gondola car, and never thought of the bridge; if he had known how near he was to it, he would not have gone on top of the house car, and if he had seen the bridge would have sat down. He further states that he never made any complaint to any officer of the company of the lowness of the bridge; knew that the bridge which was there before 1872, was too low to allow him to pass under it standing on top of the new house cars, and always stooped in going under it; had heard that the new bridge was higher, but did not know how much higher, did not know till that morning that he could not pass under it with safety standing on a house car, might have supposed it was too low, but could not tell it till he was struck.

It appeared in proof also that the appellee lived in Martinsburg, was well acquainted with "Bull Eye" bridge,

its position and surroundings, and while in the employ of the company made about thirty trips a month, fifteen each way, and had passed under the bridge over 3000 times, or nearly 1500 times after the new or higher cars were generally used.

Other testimony is offered which it is not necessary to repeat. Three witnesses *McGee, Miller* and *Leonard,* employés of the the company, testified that they had been struck by the same bridge, but each explained the circumstances causing their accidents, which show that these resulted from their own carelessness and inattention, and each testified that they were caused by their own neglect and want of caution.

Now the question presented for our consideration, is, what are the rules of law applicable to the state of facts disclosed by the bills of exceptions, and which have been before stated.

To entitle the appellee to maintain the suit, it was necessary to prove that the company had been guilty of negligence which directly caused the injury, that is to say, that in the relation which existed between the appellee and the company, the latter had failed or neglected to perform some duty towards the appellee, which was devolved upon it by the law; and secondly it must appear that the appellee was not guilty of any negligence on his part, or any want of reasonable prudence and caution to avoid the accident.

1st. As to the alleged negligence on the part of the company. In what did this consist? It was said it was negligent in constructing the bridge, so low that a conductor or brakeman could not pass under it in safety, on the top of a house car, where his duty required him sometimes to be.

But there is no evidence to support this position, on the contrary all the proof shows that the employés of the company, and the appellee among them, every day passed

under the bridge safely by observing the simple and easy precaution of stooping or sitting down while passing under the bridge.

No negligence can be imputed to the company because the struts of the bridge were not high enough to allow a person to pass under them, standing upright on the top of the cars. *Baylor vs. Del. & W. R. R. Co.*, 11 *Vroom*, 23.

It was not required of the appellee to stand on his feet, while passing the bridge; he was in that position, according to his own statement, because his back was turned towards the bridge, "he did not think of it, and did not know he was near it;" but he knew it was there, it was in full view only a few moments before, when he started his train from a point only 200 or 300 yards distant.

Nothing is better settled than that "the implied contract between the employer and employé is that the latter takes upon himself all the natural risks and perils incident to the service." *Moran's Case*, 44 *Md.*, 292 ; as expressed by COCKBURN, C. J., in *Clarke vs. Holmes*, 7 *H. & N.*, 943. "When a servant enters upon an employment, he accepts the service subject to the risks incidental to it." The rule is well stated in *Wharton on Negligence, sec.* 214, "An employé who contracts for the performance of hazardous duties, assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which causes he had opportunity to ascertain."

Some stress has been laid by the appellee's counsel, on the fact that when the appellee entered the service of the Company in 1867, and for some years afterwards, the cars in use were of such size and structure, that no danger whatever was incurred by standing on the top of them in passing under the bridge, and that afterwards higher cars were introduced, upon which a person could not with safety stand erect while passing under the bridge, and this change

is relied on, as an unwarrantable increase of risk and danger to the appellee, after he had entered the service of the Company.

Many cases have occurred, in which it has been held to be the duty of the employer to give notice or warning to the employé of increased risk or danger to which he may be exposed, where a change has been made in the nature of his duties, and a failure to give such notice or warning has been held to render the employer liable for the consequences; but this principle has no application to the present case. It is applicable where the increased risk or danger to the employé arises from causes hidden and secret, and such as would reasonably escape his observation.

In this case the introduction and use of the new house cars commenced as early as 1872, was well known to the appellee, and with that knowledge he continued in the service of the Company for the space of four years.

So that in this respect, the case stands on the same ground as if the condition of things which existed at the time of the accident, was the same as when the appellee first entered the service.

The bridge was during all this time, a permanent structure visible to the appellee, and the new cars were in daily use by him during that period.

"If a man chooses to accept the employment, *or continue in it,* with the knowledge of the danger, he must abide the consequences, so far as any claim against the employer is concerned." *Wooley vs. M. D. Railway Co.,* 2 L. R., (*Ex. Div.,*) 389.

What then was the legal duty of the Company? This is well stated in the appellee's brief: "It was the duty of the Company to exercise all reasonable care to provide and maintain safe, sound and suitable machinery, roadway structures and instrumentalities; and it must not expose its employés to risks beyond those which are inci-

dent to the employment, and were in contemplation at the time of the contract of service; and the employé has a right to presume that the Company has discharged these duties." This rule is supported by *O'Connell's Case*, 20 *Md.*, 212; *Scally's Case*, 27 *Md.*, 589; *Wonder's Case*, 32 *Md.*, 419.

Let us apply it to the present case. As we have before said, the contract of service by the appellee was made, while the bridge of 1872 was standing, and the new cars were in use, or which is the same thing, he voluntarily continued in the service after that time, with a full opportunity of knowing the risk to which he was exposed. In constructing the bridge all that was incumbent on the Company, was to build it of sufficient height, to enable the employés, in the discharge of their duties, to pass under it in safety, by the use of ordinary care and prudence; and there is no evidence in the case that this duty was not performed. In our opinion the *ninth prayer* of the appellant states correctly the duty and obligation resting upon the Company in the construction of the bridge, and as there was no evidence of any negligence on the part of the Company in this respect, *the ninth prayer* ought to have been granted, which denied to the appellee the right to recover; there being a failure of evidence to support a material part of his case.

We think the evidence tended strongly to prove that the accident was caused by a want of reasonable care on the part of the appellee; but we do not rest our decision on this ground. In the midst of his pre-occupation with his duties, he might be excusable for losing sight of the danger menacing him at the moment. But this peril was one incident to the employment, in contemplation at the time of the contract, and arising from causes open and obvious, the dangerous character of which he had an opportunity to ascertain, and the risk of which he assumed.

Having stated our opinion upon the rules of law applicable to the case, which deny to the appellee the right to

recover, it is not necessary to notice particularly the several prayers contained in the record.

The first prayer of the appellee submitted to the jury, in general terms, the question of reasonable care on the part of appellant, in constructing the bridge, with a view to the safety of its employés, and also whether the appellee had used ordinary and reasonable care, under the circumstances, to avoid the accident.

Such an instruction would in some cases be correct, but as was said by ELLSWORTH, J., in *Hayden vs. Smithville Manufacturing Co.*, 29 *Conn.*, 557, when speaking of a general instruction of this kind, "it ignores the clear distinction between an employé having knowledge of the business and one having no knowledge."

"The employé here was acquainted with the hazards of the business in which he was engaged. * * * He must be held to have understood the ordinary hazards attending his employment, and therefore to have voluntarily taken upon himself the hazard, when he entered, or when with that knowledge he chose to continue in the service of the Company." There being in this case no evidence of negligence on the part of the Company, it was error to submit that question to the jury.

*Judgment reversed.*

(Decided 25th March, 1879.)