HOOPER v. COLUMBIA AND GREENVILLE R. R. COMPANY.

1. The rule laid down in *Snow* v. *Housatonic Railroad Company*, 8 *Allen*, 444, as to the duties of a railroad company towards its employés, approved.

2. *Quere:* Where a railroad company requires a brakeman to ride upon the top of its train, and at the same time maintains a bridge with a top too low for such employé to pass through in safety without stooping, is this a danger incident to the employment of a brakeman, and is there a full performance of the duty imposed upon the company in regard to the safety of their employés?

3. But an employé may waive the right to exact of his employer such appliances as the law requires, and, as a general rule, the acceptance or retention of service without complaint, after full knowledge of a permanent patent defect, amounts to a waiver of such defect.

4. Therefore, where a brakeman on top of a train, in full daylight, was struck on the back of the head and killed by the top of a bridge through which he had passed daily for three months, and always stooped to avoid injury, the railroad company are not liable in

damages to his administrator for negligence in permitting this bridge to remain as it was, and in failing to have danger-signal cords; and no special negligence in this case being shown, a non-suit was properly ordered.

5. This case distinguished from *Lasure* v. *Graniteville Manufacturing Company*, 18 *S. C.*, 276.

6. The proof by plaintiff not authorizing a reasonable inference of negligence on the part of the railroad company, the non-suit was proper.

Before KERSHAW, J., Oconee, November, 1883.

The opinion gives a full statement of the case.

*Messrs. S. P. Dendy* and *M. F. Ansel,* for appellant.

*Mr. John C. Haskell,* contra.

November 14, 1884. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This was an action by J. J. Hooper, as administrator of his son, Nelson T. Hooper, against the Columbia and Greenville Railroad Company for damages on account of the death of said intestate, while in the service of said company as brakeman, which as alleged was caused by their wrongful act, default, and negligence in keeping up, at Felton's Crossing, on their road, a bridge which was defective in being too low, and by the over-head arches of which he was killed, while in the discharge of his duty. The action was brought by the administrator for the benefit of himself as the father and the other distributees of the intestate, under the act of the legislature on that subject. The defendant corporation answered, admitting the death, but insisting that there was no defect in the bridge at Felton's Crossing; and that if so, such "defects were well known to the said Nelson T. Hooper, both before and up to the time of his death, and that he continued in such service for a number of months before his death for valuable consideration paid by defendants, knowing the said bridge, and if there was any danger attached to the passage of said bridge by the trains of the defendants, the said Nelson

T. Hooper assumed all the risks and perils incident thereto; and these defendants deny that they are responsible for the injuries arising from any defect in said bridge, which was known to said Hooper and unknown to these defendants," &c.

The case came on for trial before Judge Kershaw. It was admitted that plaintiff's intestate was struck by the over-head timbers of the bridge at Felton's Crossing, on the defendants' road, and that the injuries received produced his death. It appeared from the evidence that the intestate, Nelson T. Hooper, was a brakeman on a freight train on the defendants' road, and had been for about three months, which was his first experience on a railroad; that on the morning of November 7, 1881, in a storm of wind and rain, the train, running at maximum speed, passed under the bridge at Felton's Crossing, and soon after the conductor heard that Hooper was hurt, and stopped the train. He was found dead, his face bloody; he lay across the car, and head on arms, feet towards the side of the car on right, face turned towards the front, hands in his overcoat pockets; he was found mid-way of the car, just over the door. There was a considerable cut on the back of the head just at the edge of the hair; it was a considerable gash.

It further appeared that it was the duty of a brakeman to be on the top of the cars. Top-brakes were not used until Colonel Dodamead was superintendent (about 1870 or 1871); before that the brakeman was on the inside of the car. The bridge at Felton's was built originally in 1857, and renewed since the war. The bridge was sixteen feet from top of rail, and the height of a South Carolina railroad car (kind in use that day) is a little over eleven feet—stated by Mr. Magee, who measured one, to be eleven feet and three and one-fourth inches—leaving between the top of the cars and the timbers about four feet and eight and three-fourths inches; "a moderate stoop would pass a man under the bridge, a sitting posture would do so, but one could not stand without being knocked off." At that time there were no danger-cords to give warning of approach to the bridge; a negro man once before had been killed at the same place. He was not a train hand; got on the cars, stood up, and was killed. It also appeared that the intestate was reared in the neighborhood, and

lived with his father, the family furnishing him with clothes; that he was only about a month over twenty-one years of age, and when not engaged on the road worked for his father; that after going on the road, he had not assisted his father much in money matters, but had let him have some. He spent most of his wages for clothing, was an obedient, industrious, sober boy, getting a dollar a day as brakeman.

The company offered no evidence, but upon the close of plaintiff's, moved for a non-suit, which the judge granted, among other things saying: "The evidence for the plaintiff showed this bridge had been in the position it then was for thirty years without any change in point of height or construction from its original place and location. I cannot see under the evidence any proof that defendants have been guilty of negligence in the building of this bridge, or in maintaining it as originally constructed by the builders of the road. On the other hand, the evidence appears to point clearly to the negligence of the deceased as at least contributory, both from his certain knowledge of the bridge from passing beneath it daily, and every time being required, in order to avoid danger, to incline his body, and from the fact that his face, from the location of the injury, was directed to the rear. Upon the familiar principles of law, that one who enters the service of another takes upon himself the ordinary risks incident to the employment, and that one who has contributed to the cause of the danger of which he complains cannot recover against another who also contributed to the same causes, either or both, and I cannot, from the evidence on the part of the plaintiff, avoid the conclusion that the non-suit should be granted. . . . As to the fifth and sixth grounds of the motion for non-suit, they are refused. I am not prepared to be the pioneer in this state in announcing as a principle of law that a parent has no beneficial interest in the life of a child after the majority of such child, or to say that in this particular case there was such a failure of proof of beneficial interest as to take the case for this reason from the jury," &c.

From this order of non-suit, the plaintiff appealed upon the following grounds:

1. "Because where there is any proof to sustain the allegation of the complaint, the question must go to the jury.

2. "The question of negligence was a mixed question of law and fact, and should have been submitted to the jury.

3. "The question of negligence should have been submitted to the jury, because it was proved that the company had notice, and knew, or ought to have known, that their bridge at Felton's Crossing was too low, and dangerous to its servants and employés.

4. "The proof showing that said bridge was too low, the defendant company was liable for injuries to its employés occasioned by improper and dangerous structures if the employé was in the discharge of his duty.

5. "Under the proof, the defendant company was liable to the administrator, plaintiff, for the death of his intestate.

6. "That his honor erred in holding that the deceased was chargeable with knowledge of the dangerous condition of the bridge, it being in proof that he was young and inexperienced, and had only been in railroad service about three months, and no evidence that he was ever notified of the dangerous condition of the bridge.

7. "The question of contributory negligence, and whether the plaintiff's intestate was chargeable with knowledge of the defect in the bridge, was a question for the jury, and should have been so submitted," &c.

At common law, a right of action for a personal injury dies with the person : *actio personalis moritur cum persona.* If death is instantaneous with the injury, no right of action accrues which can survive, according to the ancient principle that "in a civil court the death of a human being cannot be complained of as an injury, whether it results from the felonious assault or the carelessness of the party causing it." This was considered a defect in the law, and most of the states of the Union have passed laws upon the subject, more or less similar to the first English precedent, known as Lord Campbell's act. Our law provides as follows :

"Section 2183. Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and

recover damages in respect thereof, then and in every such case the person or corporation who would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony.

"Section 2184. Every such action shall be for the benefit of the wife, husband, parent, and children of the person whose death shall have been so caused, and shall be brought by or in the name of the executor or administrator of such person; and in every such action the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively, for whom and for whose benefit such action shall be brought, and the amount so recovered shall be divided among the before-mentioned parties in such shares as they would have been entitled to if the deceased had died intestate and the amount recovered had been personal assets of his or her estate," &c.

The right of the administrator to recover is precisely the same as if Nelson T. Hooper had not been killed outright, but injured, and he were now suing the company for damages. In that view, did the Circuit judge commit error in granting the non-suit? That must depend upon the proper application of the doctrines of negligence, which most of the text writers say is not a fact, but an inference from facts considered in connection with the law. The intestate, Hooper, was in the employment of the company as a brakeman. In such case the rule is that "while it is true, on the one hand, that a workman or servant, on entering into an employment, by implication agrees that he will undertake the ordinary risks incident to the service in which he is engaged, it is also true, on the other hand, that the employer or master impliedly contracts that he * * * will also take due precaution to adopt and use such machinery, apparatus, tools, appliances, and means as are suitable and proper for the prosecution of the business in which his servants are engaged with a reasonable degree of safety to life and security against injury." *Snow* v. *Housatonic R. R. Co.*, 8 *Allen*, 444.

Taking this as a proper expression of the rule, we agree with

the Circuit judge that when the road was built, the bridge at Felton's Crossing was a suitable "appliance," in so far as the safety of the employés was concerned, for there was ample room to pass the train in safety, and at that time it was not made the duty of any of the employés to be on the roof outside of the cars; but in 1870 or 1871, after the bridge was built, the company required the brakemen to be on the top, and a height of bridge which was ample before might not be a suitable "appliance" under the new conditions. We are not quite sure that maintaining the bridge at its former height afterwards, making it necessary for the brakeman to bend his body in order to escape injury every time the train passed under it, was a full performance of the duty imposed upon the company in regard to the safety of their employés, or was one of the ordinary risks of the employment.

But there is another principle which applies here. We think it is settled that an employé may waive the right to exact of his employer such appliances as the law in its strictness might require, and that as a general rule the acceptance of service, or remaining in the service without complaint after full knowledge of a permanent patent defect, amounts to such waiver as to that particular defect. After the change in the position of the brakeman, the bridge remained unchanged for ten years to 1881, when the intestate entered the service of the company as a brakeman, and after full knowledge of the condition of the bridge, continued in that service without complaint for three months before the accident occurred.

The principle is thus stated in *Pierce on Railroads* at page 379: "A servant who before the injury had knowledge of the defect in the road or machinery, or who having a reasonable opportunity to inform himself, ought to have known such defects, is presumed, by remaining in the company's service, to have assumed the risks of such voluntary exposure of himself, and cannot recover for an injury resulting therefrom; and his knowledge has the same effect whether the company or master was informed or ignorant of such defect. This rule applies with special force, where the defect or danger is obvious to the senses. A servant who knows the defect and peril takes the risk of dangerous imple-

ments,  *  *  *  or of services of peculiar peril which he undertakes, and dangerous practices in which he participates ; or of injuries resulting from the projecting roof of a station-house, *or from bridges which are too low to allow him to ride standing upright on the top of the train*, and he is ordinarily chargeable, from the fact of his entering the employment with knowledge of the height of such bridge, without notice or warning from the company," &c., citing the cases of *Owen* v. *N. Y. Cent. R. R. Co.*, 1 *Lans.*, 108 ; *Baltimore & Ohio R. R. Co.* v. *Stricker*, 51 *Md.*, 47 ; *Devitt* v. *Pacific R. R. Co.*, 50 *Mo.*, 302; and *Pittsburg & C. R. R. Co.* v. *Sentmeyer*, 37 *Leg. Int.*, 194.

This is certainly the general rule, but there are well recognized exceptions, in which such conclusion will not "necessarily follow," as in our own case of *Lasure* v. *Graniteville Manufacturing Company*, 18 *S. C.*, 278, which was an action by a laborer in the employment of the defendant company for damages on account of personal injuries received in the fall of an elevated tramway, over which he was rolling cotton from the warehouse to the mill of the defendants. The distinction is thus stated by Mr. Pierce on the page before cited : "The knowledge from which it will be presumed that the servant took the risk must be such as will put him on his guard, and mere knowledge of a defect which does not inform him of the hazard is not conclusive that he assumed the risk or was negligent. The servant has been held not to be affected with such knowledge where he had a right to suppose the defect to be temporary in its character," &c.  *Snow* v. *Housatonic R. R. Co.*, *supra*. In this case the lowness of the bridge was permanent, patent, and certainly informed the intestate of the hazards incident to it.

Assuming then that the intestate took the risks incident to the condition of the bridge by his entering into the service of the company as a brakeman, and remaining in that service after he had full knowledge upon the subject, was there any proof of particular negligence on the part of the company or its agents at the time of the unfortunate accident, and which caused the same ? We do not understand it to be claimed that at the time of the accident there was any such special act of negligence; and in that view there was no evidence to charge the company, whether

there was or was not any want of proper care on the part of the intestate himself. It is true the train was running fast, not, however, at greater speed than the maximum allowed (15 miles an hour) on the T rail. It was running from Belton towards Walhalla, in the face of a northeast storm of wind and rain. The intestate, as brakeman, was on the top of the cars without shelter, where his duty required him to be in foul as in fair weather, and the proof seems to indicate that, exposed as he was, and probably overlooking the fact that they were approaching Felton's Crossing, he put his hands in his overcoat pockets, turned his back to the pelting storm, and was dashed to death by the timbers of the bridge striking him on the back of the neck. However much to be regretted, we do not see, under all the circumstances, that it can be considered as other than a sad accident, the proximate cause of which was the failure of the intestate to observe the bridge, occasioned probably by his position in protecting himself from the storm.

It is, however, strongly pressed upon the court that there were facts involved, and they should have been left to the jury. It is true, as this court has often ruled, that a non-suit for want of evidence should not be granted where there is any evidence to go to the jury, whose exclusive province it is to decide upon the weight of conflicting testimony. But we do not understand that the meaning of this rule is, that every question involving a fact must go to the jury, whether there is or is not proof to support it. If there is no conflicting evidence, and all is on one side, it may be the duty of a judge to direct a non-suit, as it would be a nugatory thing to send such an unsupported case to the jury. *Brown v. Frost*, 2 *Bay*, 126 ; *Hopkins* v. *DeGraffenreid, Ibid,* 441 ; *McCall* v. *Cohen*, 16 *S. C.*, 448. A high authority expresses the principle in this form : "The judge has to say whether any facts have been established by evidence, from which negligence *may be* reasonably inferred : the jurors have to say whether, from these facts, when submitted to them, negligence ought to be inferred. The relevancy of evidence, and whether any exist which tends to prove, or is capable of proving, negligence, is for the court." *Pierce*, 312.

There were no facts in the case, except as to the height of

the bridge and the absence of danger cords, the employment of the intestate as brakeman on the road, and as to his knowledge of the condition of the bridge. We agree with the Circuit judge, that the proof bearing upon these facts did not, in favor of the intestate, authorize a reasonable inference of negligence on the part of the company. As to the condition of the bridge and the employment of the intestate as brakeman there could be no doubt, and it seems to us, after making all proper allowance on account of his youth and inexperience, there could be as little as to his knowledge of the height of a bridge under which he had passed every day for three months.

This view makes it unnecessary to consider the other question, which was so fully argued at the bar, as to whether, under our statute, a parent can recover damages resulting from the death of a son, who is over the age of twenty-one years, and acting for himself. As that question is not involved in the case, we prefer to reserve our opinion.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.