Scribner, J.
This is a petition in error, brought to reverse the judgment of the court of common pleas in a case in which Fanny Shook, administratrix, above named, was plaintiff and the Railroad Company was defendant. The action was brought in the court of common pleas to recover damages under the statute commonly known as Lord Campbell’s act, for negligently causing the death oí decedent, James A. Shook, who was the husband of Fanny Shook, was a brakeman in the employ of the railway company, and had been in their employ for a period of about two years prior to the accident which resulted in his death. He was killed on December 21, 1884, and it is alleged that his death was occasioned by his head coming in contact *666 with a bridge which had been constructed and maintained for a number of years across the tracks of the railway company on the east side of the Maumee river, which is a point within the limits of the city of Toledo. At the time of his death, he was on the top of a freight train of cars and was engaged, as the evidence tends to show, in setting and unsetting or releasing the brakes.
The complaint is, that the company negligently put into its train of cars the car upon which the defendant was standing at the time of the accident resulting in his death, and that that car was of unusual height — a car commonly known as a refrigerator car — and was so high that a brakeman on its top, engaged in the prosecution of the business of the company, could not safely pass under the bridge- — -in other words, that he could not pass under the bridge standing in an erect posture on the top of the car without bringing his head in contact with the bridge. The bridge was constructed, perhaps thirteen years since, by the city of Toledo, and has been maintained by the city ever since. The company had nothing to do with its erection or in maintaining it; it was a structure erected and maintained by the city during all that period of time. The plaintiff below did not complain of the company for erecting or maintaining the bridge, but simply complained of the defendant for putting this car, or cars of the same character, into its trains, requiring the plaintiff’s decedent to prosecute the business of the company as a brakeman upon the top of such cars,and thus exposing him to danger without giving him notice of the danger to which he was exposed.
It appears that Mr. Shook was in the employ of the company as a brakeman for the period of about two years. There had been some intermission in this service, perhaps, but not for any considerable period of time. His “run,” as it is ordinarily called, was between Air Line Junction, lying to the westward of the Maumee river, and Collinwood, lying east of Cleveland.
The testimony shows that at the time Mr. Shook entered into the service of the company, the company had been in the habit of putting cars of the kind complained of — refrigerator cars — which ranged from one to two feet or more higher than the cars which were in ordinary use — -into its *667 trains, loaded, as the testimony tends to show, at the packing houses, and were sent through to the eastward, and, when unloaded, were returned with the trains, mixed and intermingled with other freight cars as it happened. It seems that on Sunday morning, December 21, 1884, somewhere from eight to ten o’clock in the morning — as the train approached Toledo from the east, a signal was given to put on the brakes just before reaching this bridge at which the accident occurred. This was required because, about two hundred feet to the westerly of the bridge, was a railroad crossing of the Cincinnati, Hamilton and Dayton tracK which crosses the railroad of the Lake Shore Company at that point. The decedent was the rear brakeman. When the signal was given to put on the brakes, he had gone forward from the rear part of the train setting the brakes and he proceeded forward toward the middle part of the train — ■ which consisted of some forty or forty-five cars apparently —and when the signal was given to release the brakes again he had turned and was passing backwards towards the rear part of the train,letting off the brakes in order that the train might pass on over the river until it should approach the Wabash crossing just on the west side of the river. There is testimony showing that he was on the top of the car, letting off brakes, and there was the testimony of the witness Callahan, who says that he saw him in the act of stepping over towards the brake when he was struck by the side of the bridge and knocked from the end of the car down between the cars. The testimony shows that his body struck the ground — which was covered with snow — about fifty feet to, the westward of the bridge, indicating that he had fallen between the cars, and had either caught or been caught by some of the machinery or apparatus of the train, and been carried in that position until the train had j assed under the bridge and had reached a point about fifty feet beyond, when his body appears to have come in contact with the ground and was dragged fifty feet further, where blood was found upon the ground. He was found upon the front end of the car upon the north side of the train — a car known as a Red Line car, immediately in rear of the refrigerator car, which the testimony of Callahan shows he was standing upon immediately before. He was found under the end of the. *668 car close in the vicinity of the forward wheel and caught by the brake, his head to the westward, in the direction in which the car was going, badly mangled, badly injured, and his legs crushed. He was taken out, taken to a hospital, but died almost immediately after he was taken from under the cars. His hat was found between the draw bars of the refrigerator car and the Red Line car immediately in the rear of it, and was “pinched,” as the witness states it, between the draw bars.
It is disputed on the part of the plaintiff in error that the defendant was knocked from the car by a bridge; it is insisted that he slipped and fell from the car, and that the testimony of Mr. Oallahan in that particular is not worthy of credence, from the fact that it is said he made no report of the transaction; that he didn’t go to the spot where the man had fallen and paid no attention to it; that he was at the spring getting water, and went home, and it is farther insisted that there were no marks upon his head to indicate that his head had come in contact with the bridge.
Without going very carefully into that branch of the case, it is sufficient to say that we do not feel warranted in finding that the verdict of the jury in this particular, was contrary to the weight of the evidence; it was for them to give such credence to the testimony of Mr. Callahan, who testified directly upon this point, as they felt it their duty to do in the light of other testimony attending the transaction, and we assume, for the purpose of the view we take of the case, that Mr. Shook was knocked from the top of the car by his head coming in contact with the bridge, as is claimed on the part of the plaintiff below.
But the principal question is — the great question in the case, is, as to whether or not the jury were warranted in finding, from all of the testimony in the case, that the company was guilty of negligence in putting the refrigerator car into this train, as it had been accustomed to do during all of the period that Mr. Shook was in the employ of the company upon this road, and whether or not Mr. Shook was not chargeable with knowledge of the danger to which he was exposed in passing under this bridge at the time this accident occurred, so as in a measure to have waived any objection on his part against the action of the company in *669 placing such cars in its trains, and whether he was not guilty of contributory negligence in not taking care of himself in passing under the bridge and in his collision with the bridge.
The testimony shows that a man of Mr. Shook’s height —about five feet eight inches, in the neighborhood of six feet — standing upon the top of one of these refrigerator-cars, could not pass under it in an erect position without his head coming in contact with the bridge. By stooping somewhat, he could have passed in safety under the bridge. It seems that upon a great many of the cars that the company was accustomed to carry in its trains which passed under this bridge, there was no difficulty for a man of his height standing upright in passing under it without exposing himself to actual contact with the bridge; but upon cars of this height, a man could not pass under the bridge without coming in contact with it unless he stooped somewhat in order to avoid danger.
As I have said, testimony shows very clearly — -and it is uncontradicted — that the company had been accustomed to place cars of this structure and of this height in its trains, and intermixed them promiscuously with its other cars. Mr. Shook had been accustomed to pass under this bridge nearly every day for a period of nearly two years. It was essential, was usual and was required that in approaching this bridge the brakeman should set the brakes before passing under the bridge, by reason of the crossing which I have spoken of — the Dayton and Michigan cossing — which was only about two hundred feet to the westward of the bridge, so that upon every occasion when Mr. Shook approached this bridge from the east, his duty required him to be upon the top of the train to set the brakes before approaching the bridge, which was plainly visible to him, and then to loosen the brakes after the stop had been made, to proceed across the bridge and then set the brakes for the Wabash crossing on the western side. He was accustomed to pass under the bridge upon every trip he made, either from Air Line Junction to Oollinwood or from Gollinwood to Air Line Junction. The nature, the character of the bridge was visible for some several hundred feet in either direction, and it seems to us that it was absolutely impos *670 sible for a man so employed and passing daily under the structure — -required to stop his train in the vicinity of the structure, passing sometimes upon cars of one height and sometimes upon cars of another height, it seems almost an impossibility that a man so employed should not be able to see and appreciate the danger to which he was exposed by reason of tihs structure.
A great many cases have been cited on the part of'counsel for plaintiff in error in this case, to show that under such circumstances the railway company cannot be held responsible; and, indeed, the court in its charge to the jury, said to the jury in this case that if the plaintiff’s decedent knew, or by the exercise of reasonable care should have known the danger to which he was exposed, that there was no liability upon the part of the company. But the jury, notwithstanding this instruction on the part of the court, and notwithstanding the fact that Mr, Shook was thus daily engaged in passing — approaching and passing this bridge upon trains of cars made up in part of the identical car upon which he was standing at the time this accident occurred, must have disregarded this instruction of the court to the jury.
Among the numerous cases which were cited, was Wells v. Railway Co., 56 Iowa, 520, which decides that:
“Where it was shown that a brakeman, who was knocked from the top of a car by a bridge, had been employed on the same portion of the road for several years, and knew the height of the bridges, but remained in the service without protest, it was held that he thereby waived the negligence of the company in that regard.”
And a very interesting and instructive case is found in 92 Penn. St., 279, which was decided by Chief Justice Sharswood,and Justices Mercur,G-ord.on, Paxson and Turnkey. This was the same kind of a case- — -where a man was killed by coming in contact with a bridge. In the opinion, the court use this language:
“The bridge by which young Sentmeyer was killed was fifteen feet and six inches in height from the top of the railroad rails, whilst the height to the cars varied from nine to ten and one-half feet; thus, for the lower cars, the bridge *671 was sufficiently high, but for the higher ones, several inches too low.”
This is precisely the case here.
“Sentmeyer had been for several months previous to the accident, employed as flagman on one of the trains of this road, and therefore had, or ought to have had, knowledge of the height of the cars used upon it,and also of the height of this bridge. These were matters which addressed themselves to his own observation, and, as we have already said, for the prudent exercise of that observation he was responsible. But did he give such attention to the dangers to which he was exposed as an ordinarily prudent man should have given to them? Certainly not, or the accident would not have occurred. He had almost every day for a month passed and repassed under that bridge.”
In our case, it had been almost every day for two years. J‘He knew just where to look for it, and if he paid, any attention to it whatever, he must have known that when standing at full length upon a car of medium height, say nine feet six inches, that there was but an inch or two between the bridge and the top of his head. What shall we say, then, of that man’s prudence who would thus risk his life on the difference of two or three inches in the height of a car? But the court below held the company rigidly to what it regarded as its duty in regard to the bridge, without any reference to the duty resting upon the deceased to give heed to a known and obvious danger, and prudently care for himself. ” * * “‘If the jury believe from the evidence that it was required of the employes of the company,of the same class as Sentmeyer, and was usual and customary for them to be on the top of freight and stock cars whilst in motion, and the defendant permitted a bridge to be erected and maintained over its track of a height insufficient to allow the safe passage of persons while on the top of such freight or stock cars, and that while on the top of such cars Sentmeyer was knocked off and killed while in the service of the company; they may find that the death of Sentmeyer was caused by such negligence of the company, as would make it liable to the plaintiffs in damages therefor. ’ This point was affirmed without qualification, and it amounts to an instruction that the defendant was bound to have all the *672 bridges, crossing its road, of such a height that whether its employes were careful or negligent no damage could result to them therefrom.”
“But what is the logical result of a doctrine such as this? Is it not, that the company must not only guard its servants from probable, but also from possible dangers, and that it must place no dependence on their care and skill even in the matter of their own preservation and personal safety ? That it must provide against their very negligence and become an insurer of their limbs and lives? We need not say this will not do; that neither natural nor artificial persons can bear such a burden as this, neither ought they so to do. When men are hired, something must be predicated of their judgment and prudence, and, hence, when the employer furnishes them with tools and appliances, which, though not the best possible, may, by ordinary care, be used without danger, he has discharged his duty,and is not responsible for accidents. ’ ’
And among the cases cited, is also B. & O. R. R. Co. v. Stricker, 51 Md., 47, which, in many particulars, resembles this case. The Chief Justice, in delivering the opinion, says:
‘‘This suit was brought by the appellee to recover for injuries received by being carried against a bridge, spanning the appellant’s road, while he was on top of a ‘house car,’ in the discharge of his duty as conductor of a freight train.
‘‘It appears from the evidence, that the appellee entered the service of the company in 1867, as brakeman on freight trains between Martinsburg and Baltimore. In July, 1869, he was promoted to be conductor of freight trains on the-same section of the road, and continued in that employment till the time of the accident. In that capacity it was his duty to assist at the brakes.
“When the appellee first went upon the road, the house cars of the company were from nine to ten feet high; about the year 1869, connection with western roads began to be formed, and higher cars were introduced from the west. The company also began to construct new cars, which were ten feet ten inches to eleven feet high, and the western cars, sometimes used, were eleven and a half feet high. The plaintiff testifies that some of the new cara were on the road *673 whilst he was brakeman; the number of these was increased, and they were m general use after 1872 or 1873. They were constructed with the brakes on top, and to manage the brakes it was necessary to be on top of the car. In 1872, the old bridge was removed, and a new bridge built, which was of different construction, and of about the same height as the old one, that is to say, seventeen feet four inches high, measuring from the railway to the struts or lowermost timbers of the bridge.
It was at that bridge that the plaintiff in that action was injured.
“The accident happened in this way: The appellee was assisted by one brakeman, who remained behind to lock the switch; the appellee being specially charged to see that this important duty was performed, held the train waiting till it was done. He was standing on the sixth or seventh car from the rear of the train, looking back to see the brakeman lock the switch, and for his signal; when he saw this, he immediately signalled the engineer to go on, and began to let off Ihe brakes as far back as the house car, which was the last car except the caboose. He had got on top of it about the center, and was walking towards the brake, for the purpose of letting it off and then going into the caboose, when he was struck by the strut of the bridge, his back being then turned towards it.
“The appellee testified that he had never heard of any one having been struck by this bridge, before he was struck; that no one on the part of the company had ever told or notified him that this bridge was too low; that he did not know its exact height, but supposed that the struts were high enough to clear a man standing on top of such a car as he had. Had never before had occasion to be adjusting the brakes, to be walking on top of a car as he was passing under that bridge. Had been on the siding often before, but had never started from it on his trips; had always started from the station, and that gave him ample time to have the brakes adjusted before he got to the bridge. * * * There were no signal ropes to warn persons approaching the bridge,. such as were used at some of the other bridges.
“On the other hand a number of witnesses, examined by the defendant, conductors, brakemen and engineers, em *674 ployed on the same section of the road, testified that this bridge was too low to allow a tall man to pass under it, standing upon a house ear.”
It may be seen that this bridge was so low that the plaintiff, being nearly six feet high, could not pass under it, yet that other men of less height, could pass under it — though it might be pretty low, without their stooping some.
“That this fact was plainly visible and obvious to any one passing under it, and that it was the habit of brakemen and conductors, when on top of a house car, to stoop or remain seated while passing under the bridge. Two of them, Bierman,the engineer, and Dixon,the brakeman, who were on the same train with the appellee when he was struck, both testify that they had often seen him stoop down when passing under the same bridge. And the appellee himself stated in his testimony that he was down on the gondola car and never thought of the bridge; if he had known how near he was to it, he would not have gone on top of the house car, and if he had seen the bridge,he would have sat down, ” etc.
The court, after making this statement of the facts of the case, say this:
“As to alleged negligence on the part of the company. In what did this consist? It was said it was negligent in constructing the bridge,” (it will be observed that all these bridges were maintained by the company), “so low that a conductor or brakeman could not pass under it in safety on the top of a house car, where his duty required him sometimes to be.
“But there is no evidence to support this position; on the contrary,all the proof shows that the employes of the company, and the appellee among them, every day passed under the bridge safely by observing the simple and easy precaution of stooping or sitting down while.passing under the bridge.”
In this case it does not appear that any person had ever been injured on this bridge on any occasion.
“No negligence can be imputed to the company because the struts of the bridge were not high enough to allow a person to pass under them standing upright on the top of the cars.
*675 “It was not required of the appellee to stand on his feet while passing the bridge; he was in that position, according to his own statement, because his back was turned towards the bridge.” He did not think of it, and did not know he was near it; “but he knew it was there; it was in full view only a few moments before, when he started his train from a point only 200 or 300 yards distant. * * * ”
“Some stress has been laid by the appellee’s counsel on the fact that when the appellee entered the service of the company, in 1867, and for some years afterwards, the cars in use were of such size and structure, that no danger whatever was incurred by standing on the top of them in passing under the bridge, and that afterwards higher cars were introduced, upon which a person could not with safety stand erect while passing under the bridge, and this change is relied on, as an unwarrantable increase of risk and danger to the appellee, after he had entered the service of the company.
“Many cases have occurred, in which it has been held to be the duty of the employer to give notice or warning to the employe of increased risk or danger to which he may be exposed where a change has been made in the nature of •his duties, and a failure to give such notice or warning has 'been held to render the employer liable for the consequences; but this principle has no application to the present •case. It is applicable where the increased risk or danger to the employe arises from causes hidden and secret, and •such as would reasonably escape his observation. * * *”
“We think the evidence tended strongly to prove that the accident was caused by a want of reasonable care on the part of the appellee; but we do not rest our decision on this .ground. In the midst of his preoccupation with his duties, he might be excusable for losing sight of the danger menacing him at the moment. But this peril was one incident to the employment, in contemplation at the time of the contract, and arising from causes open and obvious, the dangerous character of which he had an opportunity to ascertain, and the risk of which he assumed.”
Here it is very probable that this man, who was in a position to know as well as any person possibly could know without having made an actual measurement of the differ *676 ence in the height of the cars and the height of one bridge —he was in a position to know better than any person could know except where such measurement had been made— what precisely the danger was to which he was exposed in passing under the bridge on the top of that car, and it may be that for a moment, engaged in letting off these brakes, his mind was so preoccupied that he forgot the danger; but, notwithstanding, it was one open and apparent to him, and the risk was one which, with the knowledge he must have had, he assumed to himself.
The only other case to which I will refer is Owen v. Railroad Co., 1 Lansing, 108, affirmed subsequently in the court of appeals. I will read only one paragraph from the opinion of the court:
“The risk of injury, by means of the passage of the train of cars under the bridge in question, must be held to have been assumed by the plaintiff when he entered the defendant’s service as a brakeman on the train. He had been in the defendant’s employ in the same capacity, and upon the same train, before the present employment for a year or more, at which time he had passed daily under this same bridge, which has been at its present height ever since the road was constructed. The danger was open and obvious, and within the plaintiff’s personal knowledge when he entered defendant’s service the last time. It was a danger clearly incident to the service he undertook to perform. He knew, as well as his employer, the perils of the business, at least as respects the bridge in question, and the law will imply that he assumed the risk of personal injury.’’
As I have stated, there are many more cases which tend stmngly to support th doctrine.
Upon the part of the defense, a case in 104 Indiana is cited, and which we have examined.to some extent, contravening the doctrine of the current of authority. But that case was decided upon a demurrer to the petition in which the averments upon which the plaintiff there relied for recovery, made a strong case against the railroad company, and on the demurrer admitting the facts so alleged, it was held by the court that a case was made which would entitle the plaintiff to recover if the facts stated were proved. The *677 court in that case held and considered that they would depart somewhat from the general doctrine as laid down by the authorities, and used somewhat strong language in regard to what they call “man traps.” The bridge there, however, had been constructed and maintained by the company itself.
A case is cited from Kansas, found in the Pacific Reporter, where a conductor was injured by coming in contact with a bridge while on top of a train. It appeared in that case that a man might safely pass in an erect position under the bridge while standing on the flat portion of th train, but was exposed to danger of contact while upon tb e other portion of the train. Cider, the conductor, testified that he had no knowledge that there was any danger, and that he had only been passing along that part of the road for ten months,and that only once upon the top of the cars in passing under the bridge.
It is argued here with a good deal of force that it was the duty of the railroad company to ascertain and to report to its employes — to ascertain whether there was any danger in passing trains of cars with a brakeman upon the top, discharging his duties, under this bridge, or similar structures, if they were found to be dangerous, and give actual notice to its employes of the danger to which they were exposed; but, unless the company should make an actual measurement and ascertain with precision and-exactness the height between the top of the rail and the structure above — between the top of the rail and the height of the cars — and ascertain precisely what space there was; unless they made an actual measurement, unless they were required to do that, and did do that, the officers of the company were not in a position to know what that distance was, nor could they be as well informed upon that subject as a man who was in the habit, upon the top of a train of cars, of passing under the bridge. A man in that position, looking as the train approached the bridge, is in a far better position to know what th« danger is than any of the officers or agents of the company could possibly know, except they took pains to make an actual measurement of the intervening space, and a man upon the top of a train of cars approaching and passing this bridge, stopping his train, set *678 ting his brakes and letting them off again, in passing under it, was in a position where it would seem he must have known, and could not have avoided knowing, unless he shuts his eyes, precisely the danger to which he was exposed; and if he passed under this bridge standing erect upon a train of cars which were two feet or eighteen inches lower than the refrigerator car upon which he was hurt, he could not fail to see how near his head would come to the bridge under which he was passing; and he could not fail to see when these trains were made up of these different cars, of different heights, the difference between the height of ordinary cars and the tops of these refrigerator cars.
So it seems to us that, upon the testimony in this case, it appears beyond all reasonable doubt or question, that the defendant must have known the danger to which he was exposed in passing under the bridge.
We have looked through the charges of the court,and we see no reason to complain of the instructions which were given except in one particular. We think that the exceptions which were taken to various portions of the charge were not well taken.
There were some requests made by the defendant below which we think were substantially correct,and which should perhaps have been given; but they were, in substance, given in other requests; so we think the defendant below — -the railway companj — -has no reason to complain except of the action of the court in giving the fourth request of the plaintiff below, which is in these words:
“The defendant, the railroad company, was in duty bound to ascertain whether the cars in its trains would admit of a safe passage by the brakemen under the bridge before running its trains with brakemen under the same while such brakemen were in the discharge of their duties as such.”
That is to say, the jury were instructed by the court that it was the duty of the company to ascertain whether a brakeman standing erect upon the top of any one of its cars passing under any one of the bridges which spanned its track, under this bridge more particularly as is mentioned in the request, whether he could pass safely in an erect posture under the bridge. It imposes upon the railroad company a *679 duty of making an actual measurement to ascertain the intervening space, and to determine whether or not the tallest man in the employ of the company could pass in an erect posture in safety under that bridge. Now. we do not think that any such duty as that devolved upon the railroad company. We do not think that it was bound to go about measuring its cars — the height of them — and measuring the space between the top of the rails and the lower portions of any bridge overhanging its track to ascertain exactly whether such brakeman could pass in an erect posture, in safety, under the bridge. We do not understand that it is the legal duty of the railroad company to have its bridges —even where it constructs its own bridges — erected at such an elevation that the tallest man may pass safely under them without stooping. We think that the question should have been left for the jury to determine whether or not the railroad company was guilty of any negligence in this particular — that is to say, that the jury should have been instructed to determine whether or not the railroad company, in the exercise of ordinary care in reference to these circumstances, had discharged its duty in this particular. But here is the doctrine stated that it was the absolute duty of the defendant to ascertain whether the cars in its trains would admit of the safe passage by the trains under its bridge before running its trains with brakemen upon them under the same while such brakemen were in the discharge of their duties as such.
Now, was it not the duty of this brakeman to know whether or not he could pass in safety under this bridge when he was in the habit of passing under there every day ? If it was not negligence of the brakeman not to ascertain whether or not he could pass under a structure plainly visible before his eyes, how could it be asid that the company was negligent in not ascertaining that fact? We think that while the brakeman was so employed as that it was plain before his eyes what the character of the structure was, and what its height was, if it was not negligence upon his part to observe that danger, there would be no negligence on the part of the railorad company in failing to observe the danger, because we do not think it was incumbent upon the company to make actual measurements in such a case as that.
*680 There is one exception taken by the plaintiff in regard to the ruling of the court in rejecting the testimony of the coroner, Dr. Hollister, upon a certain point. The doctor was asked to give his opinion as to the manner in which the deceased met his death — In other words, whether he was knocked off the train, or whether he slipped off the train. We do not think that was a question for a medical expert to decide upon; therefore it was properly excluded. But for error in giving the fourth request by the plaintiff, and because we think the verdict not sustained by sufficient evidence, and contrary to law, the judgment will be reversed and set aside, and the case remanded for a new trial.
Counsel: I would like to know if the court passes substantially upon the motion made by counsel to take the case from the jury. ■
HJThe Court: Yes; we affirm the action of the court in refusing to take the case from the jury under the testimony. The only error we find is the charge of the court in the particular excepted to and in the refusal to grant a new trial upon the ground that the verdict was contrary to the evidence and to the law.