## STATE, USE OF MARY ECKHARDT ET AL., *vs.* THE LAZARETTO GUANO COMPANY.

*Master and Servant—Dangerous Employment—Assumption of Risk.*

When the work carried on is dangerous to life or health, the employer is bound to take all reasonable precautions to secure the safety of his employees, and must make known to them the inherent dangers of the service and especially those risks which are ascertainable only through a knowledge of scientific facts which an uneducated man is not presumed to know. But if a man chooses to accept and continue in such dangerous employment with knowledge of the risks attending it, he has no claim against his emyloyer for an injury suffered from such risks.

The deceased, an employee in defendant's fertilizer factory, was poisoned by the fumes of gas while repairing a leak in the floor of an acid chamber. The chamber was lined with lead, and sulphuric acid was there produced from sulphur or pyrites. When it became necessary to repair such a leak, the flow of acid and gas was cut off, but even afterwards some liquid acid would remain on the floor and some injurious gases in the chamber. Workmen who entered to make repairs were compelled to wear rubber boots and gloves, and remained inside but a few minutes at a time so as to prevent too great an inhalation of the gases. The workmen were fully acquainted with the danger and fastened sponges or cotton waste over their mouths and nostrils when exposed to the gases. Plaintiff's deceased, who had worked at the factory for some years, went with another workman into an acid chamber to repair a leak in the floor. It did not appear how long he remained there, but on that day he returned home ill, and died two days thereafter from the effect of the inhala-

tion of gas. *Held*, that since the deceased knew of the dangerous character of the work in question, he took upon himself the risks of the employment, and in the absence of any proof of negligence on the part of the defendant, the plaintiff is not entitled to recover damages for a death caused in this manner.

Appeal from the Court of Common Pleas (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*William Colton* (with whom was *H. Tebbs* on the brief), for the appellants.

It is not denied that there are occupations which are extra-hazardous, and that where it is made to appear that the master has fairly used every reasonable method and appliance, not necessarily the most advanced or best, to minimize the danger and hazard of those employed, then if injury occur to the servant within the usual course of his employment a case is not presented for the recovery from the employer of compensation to the plaintiff. But the case under consideration is wholly different from such supposed case, and the facts as disclosed by the testimony abundantly show that the direct cause of the death of the husband and father of the equitable plaintiffs in this case was the failure on the part of the defendant corporation to furnish and provide the deceased with a reasonably safe and proper place in which to perform the work he was called on to perform for the defendant, aggravated by the neglect on the part of the defendant to make, promulgate and enforce rules for the guidance and control of its servants engaged in the performance of the business which the deceased was called on to perform at the time complained of herein. The testimony also abundantly shows that the original employment of the deceased by the defendant was to perform laborious but not dangerous work, and that the ordinary risks, if any, attendant on his original employment were greatly enhanced by requiring him to do the work, in the doing of which he lost his life. The deceased was only an ordinary laborer,

and the proof shows that he did not possess such knowledge as would enable him to ascertain the great risk to his life or well-being which he incurred when he entered the acid chamber of the defendant to stop the leak in the pan under the conditions which there prevailed.   It is true he knew there was liquid acid on the floor or pan of the chamber, because his superiors had furnished him the gum boots for the protection of his feet, and gum gloves for the protection of his hands ; the defendant also knew this, because it furnished him the gum boots and gum gloves for that very reason—there could be no other reason for supplying the deceased with such gum boots and gloves.   In order that the deceased might know of the great risk and danger which attended him in entering and working in this chamber, it would be necessary for him to have knowledge of scientific conditions ; to know the result that would certainly or at least probably follow, because of the chemical combinations that were present in that chamber ; to know that as certainly as he walked along the bottom of that chamber he would stir up the gases collected therein, and that the necessary inhalation by him of such gases would be fatal under the conditions prevailing ; to know as matter of scientific knowledge that the hole cut in the curtain and through which he made his entrance into the chamber could by no reasonable probability sufficiently ventilate this chamber to make it reasonably safe for him to perform the work he was required to perform in mending the leak in the pan.   A man who has received a training which every person should receive who has charge of the lives of laboring men, such as are usually found in the plant conducted by the defendant, would readily ascertain the quality of the air present in such a chamber under the conditions prevailing at the time the deceased was required to perform the work for the defendant therein, by inserting therein a piece of moistened blue litmus paper that might be had for the expense of a penny which would indicate the presence of the dangerous acids collected therein by turning red.   This

simple process, it will be argued, would certainly be known to every man of the most slender scientific attainment, but was wholly unknown to the rough laborer who had never heard of litmus paper and who would have regarded it as curious and unusual, and to whom it would have been curious and unusual, to the same extent that it was ordinary and usual to the knowledge of a chemist or superintendent. *Smith* v. *Peninsular Car Works,* 60 Mich. 501 ; *Swift Co.* v. *Fue,* 66 Ill. App. 651 ; *Mather* v. *Rillston,* 156 U. S. 391 ; *Myhan* v. *La. Elec Co.,* 7 L. R. A. 172 ; *McGovern* v. *Central Vt. R. Co.,* 123 N. Y. 280 ; *Stuckey* v. *Orleans R. Co.,* 23 So. Rep. 342 ; *Stout* v. *Sioux City,* 17 Wall. 657. It plainly was the defendant's duty to have known it was dangerous for the deceased to do its bidding in repairing the acid chamber. The defendant neglecting the performance of its duty has been negligent, and one guilty of negligence under the circumstances of the defendant in this case should be responsible for all the consequences which a prudent and experienced man fully acquainted with all the conditions which, in fact, existed, whether they would have been ascertained by reasonable diligence or not, would have thought at the time of the negligent act reasonably probable to follow if they had been suggested to his mind. 1 *Shearman & Redfield on Neg.,* 29 ; *Griffin* v. *United Elec. Light Co.,* 164 Mass. It is no defence that a particularly injurous consequence is improbable and not to be reasonably expected if it really appear that it naturally follows from the negligence under examination. *Wharton, Neg.,* sec. 77. The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury ; it is not a question of science or of legal knowledge ; it is to be determined as a fact in view of all the circumstances of fact attending it. *Milwaukee, &c., Ry.* v. *Kellog,* 94 U. S. 469–75 ; *Greenland* v. *Chaplain,* 5 Exch. 24–8 ; *Ryan* v. *Los Angeles Co.,* 44 Pac. Rep. 471 ; *Ingerman* v. *Moore,* 90 Cal. 421 ; *Lane* v. *Atlantic Works,* 11 Mass. 139 ; *Le Croy* v. *Ry. Co.,* 57 Hun. 67.

Proper rules should be formulated and enforced in an establishment like the defendant's. The only means the plaintiffs had at hand to show the absence of such rules was the testimony of the witness Armstrong, who was the paymaster of the defendant company, constantly in its office, walking over its entire plant, with every opportunity for observing and ascertaining its rules and regulations with reference to the repairing of acid chambers or other work to be done, and from his knowledge there was no such rules or regulations, printed or written, nor had any instructions been promulgated verbally for this purpose. This witness was entirely competent to offer this testimony, and as such rules and regulations could only have effect by reason of their universality, his testimony was sufficient, at least in the first instance, to show the absence of such rules and regulations. The defendant could have shown to the contrary if it were a fact. *Vose* v. *R. R.*, 2 Hurl. & Nor. 728. And no more direct proof than that offered by the plaintiff with respect to rules and regulations is ever required in the first instance. *Jerome* v. *R. R.*, 89 Mich. 416–8–9 (inspection of lumber); *Burns* v. *R. R.*, 71 Hun. 210–11 (piling lumber); *Ford* v. *R. R.*, 124 N. Y. 493–7 (piling lumber); *Lubecke* v. *R. R.*, 59 Wis. 133 (under cars); *Shehan* v. *R. R.*, 91 N. Y. 339 (running train); *R. R.* v. *Murphy*, 50 Ohio St. 135 (no direct proof of rules); *Reagan* v. *Ry.*, 93 Mo. 352; *Abel* v. *R. R.*, 128 N. Y. 662; *Abel* v. *R. R.*, 103 N. Y. 581; *Fordice* v. *Briney*, 58 Ark. 206.

And not only must it be made to appear by the defendant that such reasonable rules and regulations have been made, but that they are enforced as made, and that the knowledge of rules are brought home to the plaintiff in some reasonable way, and the reasonableness of the rules and of their enforcement and the knowledge of the plaintiff are all questions to go to the jury. *Avila* v. *Nash*, 117 Mass. 318; *R. R.* v. *Burkey*, 136 Ind. 188–9; *Whittaker* v. *R. R.*, 126 N. Y. 554; *Campbell* v. *R. R.*, 35 Hun. 506; *Pantzer* v. *Mining Co.*, 99 N. Y. 275; 14 *Amer. & Eng. Ency. of Law*, 907–8.

There is no more certain course to accomplish the desired result to make the place reasonably safe in which a servant is required to work than to make, promulgate and enforce the rules and regulations under which such servant does work; and many authorities hold this to be a personal duty resting upon the master. *Reddington* v. *R. R.*, 84 Hun, 231; *R. R.* v. *Hall*, 78 Tex. 657; *Berrendini* v. *R. R.*, 78 Hun. 454; *Murphy* v. *Hughes*, 40 Atl. Rep. 137; *Ross* v. *Varney*, 39 Atl. Rep. 552. It has been repeatedly held that where the master employs a servant to do some work that is extra-hazardous or extra-dangerous, even though there may be rules and regulations for the conduct of his business, it must be made to appear on the part of the master that the servant has been warned of such danger and hazard. *DeCosta* v. *Mills*, 49 N. E. 735; *Smith* v. *R. R.*, 186 Pa. St. 28; *Foster* v. *Randall*, 50 N. E. 363. And if the servant is injured under such circumstances the absence of notice or warning is inferred. *Smith* v. *Car Works*, 60 Mich. 501; *Swift* v. *Fue*, 66 Ill. App. 656; *Myhern* v. *Elec. Co.*, 41 La. Ann. 964; *Camp* v. *Hall*, 22 Southern, 792; *Eastwood* v. *Retsof Min. Co.*, 34 N. Y. Supp. 196; *Smith* v. *Mfg. Co.*, 42 N. J. L. 467; *Brown* v. *Ann Arbor R. Co.*, 76 N. W. 407; *Filsig* v. *R. Co.*, 14 N. Y. App. Div. 345. As to the duty of the master to furnish a reasonably safe place in which the servant is to work, see *B. & O. R. Co.* v. *Baugh*, 149 U. S. 389; *State* v. *Malster*, 57 Md. 206; *Wood* v. *Heiges*, 83 Md. 268; 2 *Jaggard on Torts*, 390.

*Frank Gosnell* and *Wm. L. Marbury* (with whom was *T. M. Lanahan* on the brief), for the appellee.

The evidence adduced by the equitable plaintiffs, namely, the wife and children of the deceased, fails utterly to show by whose order the deceased was directed to go into the acid chamber, so that the question of whether it was done by a fellow-servant in that capacity alone, or a servant who the law recognizes as a vice-principal, or by the master, is entirely out

of the case, and the one and only question remaining is, whether or not the defendant was guilty of negligence in compelling or allowing its employees to work in places which were not reasonably safe and proper, and the dangers of which they could not by the exercise of reasonable diligence and intelligence have ascertained, or exposed him in the course of his employment to unnecessary risk or danger o which he was ignorant.    The law is well settled that employers are bound to provide their servants with a reasonably safe place in which they are to perform the duties assigned them, and when they require their servants to go or work in extra-hazardous places to warn them of the dangers they will encounter, or to which they will be subject; *but* when the dangers to which they will be subject in performing their tasks are such that the servant without warning from the master must appreciate; then the master is under no legal obligation to give the servant the warning he would otherwise be compelled to do.    *Michael* v. *Stanley*, 75 Md. 464; *Balto. & Pot. Ry. Co.* v. *State, use Abbott*, 75 Md. 152; *Yates* v. *McCullough Iron Co.*, 69 Md. 378; *Reed* v. *Stockmeyer*, 74 Fed. Rep. 186; *Regan* v. *Palo*, 41 Atl. Rep. 364; *Bunt* v. *Sierra Butt Gold Mining Co.*, 138 U. S. 483; *Murch* v. *Wilson's Sons Co.*, 168 Mass. 408; *Taylor* v. *Carew Mfg. Co.*, 140 Mass. 150; *Bailey on Master and Servant*, vol. 1, sections 465–506.

It has not been shown how long the deceased was in the chamber, whether or not he was compelled to stay in the chamber any stated length of time, or whether proper precautions were observed in having the chamber as free of gas as possible, or what the kind of ventilation was while the workmen were engaged in repairing the leak ; in fact, nothing was shown except that the chamber was a dangerous place to work in and that the deceased did work in it for a period of time one or two days before his death; there was absolutely nothing to show negligence on the part of the defendant, and without some evidence of negligence on the part of the defendant, the plaintiff has not established

a single right which the law recognizes as constituting a cause for allowing damages, and moreover, the fact of the failure to show at whose instance Eckhart entered the acid chamber to work, must preclude the plaintiff's right to recover, for a jury could not speculate upon the fact of whether or not he was ordered in by one whose actions bound the principal or by one for whose acts the principal was not liable; or, as far the evidence on this point is concerned, he might not have been ordered in the chamber at all, but by his own voluntary act have gone in the chamber, and through his own negligence in doing so inhaled the gases that resulted presumably in his death.   The plaintiff is bound to show that the death of Eckhart was caused by his inhaling nitric or sulphuric gases.   That the inhaling of such gases was caused by the negligence of the defendant, and that the negligence of the plaintiff did not directly contribute to his death; and if the proof fails in any one of these averments, there is no evidence upon which the case should be allowed to go to the jury.   *State, use Hamelin, et al.* v. *Malster & Reaney*, 57 Md. 287; *Yates* v. *McCullough Iron Co.*, 69 Md. 370; *Michael* v. *Stanley*, 75 Md. 464; *Balto. Traction Co.* v. *Helms*, 84 Md. 515; 30 *Appeal Div.*, N. Y. 205; 51 *N. Y. Supp.*, 602.

SCHMUCKER, J., delivered the opinion of the Court.

This action was brought under the provisions of the Code for the benefit of the widow and children of Henry P. Eckhardt, who it is alleged died from the effect of poisonous gases inhaled by him while engaged in repairing a leak in the floor of an acid chamber at the fertilizer factory of the appellee in Baltimore City.   The cause of action set up in the *narr.* was the failure of the appellee to provide Eckhardt with a reasonably safe and proper place in which to work, and reasonably safe and proper tools with which to work, the exposure of him to unnecessary risk and danger without warning while at work, and the failure to employ proper and competent co-employees, or to promulgate rules for the government of its employees.

It appears from the record that the appellee has for many years operated its factory where it also manufactured the sulphuric acid used by it in the preparation of the fertilizers. The acid was made in a series of large air-tight chambers lined with lead and connected with each other and with the furnace or burner in which the acid was produced by the application of heat to sulphur or pyrites. Leaks, from time to time occurred in the lead lining to the top and sides of these chambers and they occasionally but not often occurred in the lining at the bottom, which was lined with thicker lead, because it acted as a pan to hold the liquid acid. The leaks were mended by soldering the lead by one of the employees at the factory, who was known as the plumber or lead burner. Leaks in the top or sides of a chamber were repaired from the outside, but it was necessary for the workmen to enter the chamber in order to mend a leak in its bottom. While the manufacture of the acid was in operation the chambers were filled with sulphuric and nitric acid gases, which, when inhaled, were highly injurious to the lungs, and if continuously inhaled were fatal. It was, therefore, necessary when a leak in the bottom of a chamber was to be repaired to " shut down the chamber," that is, to stop the flow of acid and gas into it and clear it of that already there to a sufficient degree to make it safe for the workmen to enter it. Even after a chamber has been thus emptied there remains some liquid acid on its floor and such an amount of injurious gas in its interior that the men who enter it to make the repairs are compelled to wear rubber boots and gloves to protect themselves from contact with the liquid acid and are permitted to remain inside but for a few minutes at a time so as to prevent too great an inhalation of the gases remaining in the chamber and those which may be liberated by the agitation of the liquid acid on the floor in the chamber.

The same poisonous gases which are present in such quantities in the interior of the acid chambers are found in injurious quantities in other places about the factory, espec-

ially at the hot piles where the acid is agitated and mixed and stirred up with phosphate rock. These gases are so well known to be dangerous by the workmen engaged at the factory that they are accustomed when about to enter an acid chamber or to work at the other places where the gas abounds to fasten cotton-waste or sponge, which are kept at the factory for that purpose, over their mouths and nostrils to protect themselves as far as possible from inhaling the gas. The testimony was conflicting as to the efficacy of the cotton-waste and sponge as a protection to the throat and lungs of those who wear it, but the fact that the workmen sought to protect themselves by its use is evidence that the dangerous character of the gas must have been well known to those employed about the factory.

Henry P. Eckhardt was a young man twenty-three years old, of robust appearance, and apparently in good health when the injury occurred, which is supposed to have produced his death. He had been employed at the factory of the appellee for between five and six years at the time of the happening of the events which gave rise to this suit. He did ordinary labor or anything generally that he was called on to do sometimes assisting the plumber or lead burner, one of whose duties was to mend leaks in the lead lining to the acid chamber.

A leak having appeared in the floor of a large acid chamber it was arranged to mend it on the 12th of November, 1897, and sometime during the morning of that day the manufacture of acid was stopped, and at or near one o'clock Eckhardt and a fellow-workman named Schultz went into the chamber, through an opening about three feet square cut in its side, for the purpose of mending the leak in the floor. It does not appear from the record under what circumstances they went in or whether or not any warning or directions were given them at the time, or whether they were under any compulsion as to the length of time they should remain inside.

The storekeeper at the factory went to the acid chamber

at one o'clock in the afternoon and saw Eckhardt and Schultz, each clad in rubber boots and gloves, inside of the chamber, about six feet from the opening, engaged in making a clay dam a few inches high around the leak in the floor preparatory to mending it.    They both came out in two or three minutes after the storekeeper first saw them and Eckhardt was coughing and gave evidence of suffering from the effects of having inhaled the gas inside the chamber.    The storekeeper had been compelled to withdraw his head from the hole in the side of the chamber after a minute and a-half because the fumes which he encountered were so strong that they brought tears to his eyes.

It does not appear whether or not Eckhardt again entered the chamber, but about six o'clock in the evening he returned to his home ill and exhausted from the effect of inhaling the gas and the second day thereafter died, and there was testimony tending to show that the inhalation of the gas was the cause of his death.

On the day before entering the chamber Eckhardt procured from the storekeeper a pair of rubber boots, and on the same morning he procured from him a pair of rubber gloves and some soda which is used to neutralize the acid, assigning as a reason that at nine o'clock that morning the acid chamber was to be shut off and he was *going to take his turn with the others* in going into it to repair the leak. On the same day between 12 and 12.30 o'clock he said to a restaurant-keeper, from whom he got his dinner, that immediately after he finished his dinner he was going into the acid chamber to help to repair a leak.  That they would build a dam around the leak so they could repair it, and that it would be a hard job to bale the acid out of the hole and throw it over.

Upon this state of facts, the Court granted the prayer of the defendant, taking the case from the jury upon the ground that there was no evidence legally sufficient to prove that the defendant had violated any of its legal duties to the plaintiff as alleged in the declaration.

The law governing the relation of employer and employee has been the subject of many adjudications and may be said now to be fairly well settled.  Ordinarily it is incumbent upon an employer in a large manufacturing establishment like that of the present appellee to furnish a suitable place in which work may be performed with a reasonable degree of safety to his employees, and without exposure to dangers that do not come within the obvious scope of the employment as usually carried on.  He must also provide him with reasonably safe and proper tools and appliances, and must inform the employee of any latent risks of the employment which the latter would not be likely to know or appreciate, but the employer is not responsible for injuries resulting from those dangers which are the subject of common knowledge or can be readily seen by common observation, or which were known to the employee, or by the exercise on his part of a reasonable degree of prudence might have been known to him.

When the occupation carried on is in its nature so extrahazardous as to be dangerous to human life or health, both justice and humanity require that the employer should take all reasonable and needed precautions to secure safety to the employees, and make clearly known to them the inherent dangers of the service, and should especially acquaint them with such risks as are ascertainable only through a knowledge of scientific facts, which an uneducated man is not presumed to know.  Some of the cases go so far as to hold that in specially hazardous occupations the employer must make and enforce reasonable rules and regulations for the conduct of the work in order to protect the employees from the dangers of the service.  A failure on the part of the employer to afford the protection due from him to the employee will render him liable for injuries occurring to the latter as a result of such failure.  *State, use of Hamelin* v. *Malster & Reaney*, 57 Md. 306–7 ; *Balto. & Potomac Railroad Co.* v. *State*, 75 Md. 160–1 ; *Balto. & Ohio Railroad Co.* v. *Stricker*, 51 Md. 69–70 ; *Wood* v. *Heiges*, 83 Md.

267–8 ; *Mather* v. *Rillston*, 156 U. S. 391 ; *McGovern* v. *Central Vt. R. R. Co.*, 123 N. Y. 280 ; *Swift* v. *Fue*, 66 Ill. App. 656.

As over against this undoubted and just obligation of the employer, the law is equally clear, as a general rule, " that the servant assumes all such risks arising from his employment as he knew, or in the exercise of a reasonable degree of prudence might have known were naturally and reasonably incident thereto, and he cannot recover from the master for injuries arising from such patent risks " * * * "but is only required to ascertain such defects or hazards as are obvious to the senses." If he continues in the service after he has discovered or by the exercise of reasonable care would have discovered the risk or hazard of the employment he cannot recover from the employer for injuries resulting from them. *Yates* v. *McCullough Iron Co.*, 69 Md. 378 ; *B. & O. R. R. Co.* v. *Stricker, supra* ; *State* v. *Malster & Reaney, supra* ; *Wood* v. *Heiges*, 83 Md. 268–9.

In the case of *Balto. & Potomac Railroad* v. *State, use of Abbott*, 75 Md. 152, a young man of about twenty-two years of age who had been in the employ of the railroad company as a brakeman for only two or three months, when passing with his train through the Potomac tunnel in Baltimore City, fell, or was thrown from his train and killed. It did not appear whether he was overcome by the smoke and gas, of which there were considerable quantities in the tunnel, or whether he made a misstep in passing from one car to another, or what was the immediate cause of his death. The usual suit for damages for the benefit of his family was brought against the railroad company. Upon appeal this Court held that the case should have been taken from the jury. In the opinion in that case the Court say : " If it be assumed according to the contention of the plaintiff that the tunnel was not sufficiently ventilated, and that it was by reason of the density of the smoke and gas in the tunnel that the accident occurred, still there is no ground shown for the right to recover. The uncontroverted proof makes

it clear beyond question that the deceased was entirely familiar with the condition of the tunnel, and the discomforts and risks of working therein, whatever they were, as he had been in the daily habit two or three times a day of going through the tunnel as brakesman on trains.   Having accepted and continued in the employment with full knowledge of the condition of the tunnel and of the risks of the work therein he could not, if death had not ensued, have recovered for any injury sustained by reason of the condition of the tunnel, and if he could not have recovered for such injury, if living, those authorized to sue in consequence of his death cannot by the terms of the statute have any better or greater right to recover.   The principle is well settled that if a person chooses to accept employment or continue in it, with knowledge of the danger attending it, he must abide the consequences so far as any claim against the employer is concerned.   Upon any other principle it would be impossible to carry on any of the many dangerous trades and trade operations that make up the business of the country.   The cases that hold and maintain this doctrine are numerous."

In *Beittenmiller* v. *Bergner & Engel*, Supreme Court of Penna. 12 Atl. Rep. 599, a laborer was engaged in making certain repairs to a room which was filled with fumes of ammonia from leaks which could not be found.   The ammonia became so oppressive that all the workmen stopped work and left the room.   The superintendent of the brewery, in which the room was located, ordered the men to go back and finish the work.   They obeyed him and Beittenmiller on ascending, for the purposes of the work, near to the ceiling of the room, was struck in the face by a blast of the escaping ammonia and overcome and fell to the ground and was injured.   The Court held that he could not recover damages from the employer saying " the plaintiff has no one but himself to blame.   He knew the room was full of ammonia and by continuing to work in it he assumed all the risks arising from that cause."   See also *Woodley* v. *Metro.*

*Dist. Railway Co.,* 2 Ex. Div. on Appeal, 384, and *Hewitt v. Railroad Co.,* 34 N. W. Reporter (Mich.) 650 ; *Berry* v. *White Lead Co.,* 30 Hun. App. Div. 206 ; *Crown* v. *Orr,* 140 N. Y. 452–3.

In the case at bar the nature of the employment of Eckhardt about the factory, and the length of time for which it had continued before the accident to him happened, and the constant opportunity which he had to ascertain the nature of the employment and see the precautions which were observed in the factory by those whose duty in different parts of the establishment brought them in contact with the fumes of sulphuric acid, which the evidence shows was present in dangerous quantities at various points, especially at the places where the liquid acid was stirred or agitated, compel us to the conclusion that he knew or could reasonably have well known the dangerous character of the task he was about to perform when he entered the acid chamber to assist in repairing the leak. This conclusion is strengthened by the precautions which he took in procuring and wearing the gum boots and gloves, and in providing himself with a supply of soda, and also the manner in which he spoke in advance of *taking his turn with the others* in entering the chamber, and the difficulty of the job to be performed there. The fact that he knew the men were to take turns in going into the chamber is of itself evidence that it was known to be unsafe for one man to remain long at a time inside of it. The work to be done when inside consisted simply of making a small dam of clay around the hole in the floor and removing what liquid acid remained inside of the dam and then soldering the lead floor. This was not physically difficult and " the hard job to bale the acid out " of which Eckhardt spoke must have referred to the difficulties which it was known in advance would be caused by the fumes of the acid in which the work must be done. To him, under these circumstances, the danger which he faced in assisting in the repair of the leaking acid chamber must be regarded as a patent and not a latent one, and the appellee, against

which there is no direct proof of negligence, cannot be held liable for the injury which the appellants have sustained by his death.

The rule that the employer must furnish to the employee a reasonably safe place in which to work has repeatedly been held to have no application to cases in which the work itself makes the place insecure as where a place is out of repair and the employee is engaged in making it safe. In such cases the employee takes upon himself the additional risk arising from the existing condition of the work or the place. *Bailey on Personal Injuries, Relating to Master and Servant,* vol. 2, sections 3022 to 3025 ; *Finlayson* v. *Utica Mining & Milling Co.,* 67 F. R. 507 ; *Armour* v. *Hahn,* 111 U. S. 318.

It appears from the record in the present case that a leak in the bottom of an acid chamber was a dangerous place, as the liquid acid which escaped from it was highly injurious to everything with which it came in contact, whether it was the persons of the employees or the structures underneath the chamber, upon which it rested. The repair of such a leak was an effort to render safe a confessedly unsafe place, and was a task which the employees about the factory, especially those like Eckhardt, whose employment was of some years' standing, must be presumed to have known, was attended with unusual risk. For this reason, also, the appellants were not entitled to maintain their action. It follows from what we have said that the Court below properly took the case away from the jury. The judgment will be affirmed with costs.

*Judgment affirmed.*

(Decided December 6th, 1899).