# STATE OF MARYLAND, FOR THE USE OF MARY E. LINTON, WIDOW, *vs.* BALTIMORE MANUFACTURING COMPANY.

*Master and Servant—Falling Into Vat of Boiling Molasses.*

In defendant's vinegar factory, there was a molasses room, 40 ft. by 27 ft., where molasses was boiled in a vat, 6 ft. in diameter and 3½ ft. deep, the top of which was flush with the floor of the room, and no guard rails were around it. When molasses was being boiled, the steam arising obscured to some extent the view in the room. Plaintiff's deceased was employed as a laborer in another part of the factory, and none of his duties required him to enter the molasses room, and although he had on some occasions passed through it in going to other parts of the factory, it was not necessary for him to do so. In some way not explained, he fell into the vat of boiling molasses one morning, and suffered injuries which caused his death. In an action to recover damages therefor, *held*, that since there is no evidence of defendant's negligence in failing to provide a safe place for the deceased to work in, as he was not employed to work· in the molasses room, and since he had knowledge of the unguarded position of the vat into which he fell; and the danger was not hidden, and he voluntarily exposed himself to it, there can be no recovery in this case.

*Decided January 12th, 1909.*

Appeal from the Court of Common Pleas (HARLAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS and WORTHINGTON, JJ.

*Joseph N. Ulman* and *Clarence A. Tucker,* for the appellant.

*Vernon Cook* and *Wilton Snowden, Jr.,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellant, Mary E. Linton, plaintiff below, brought this suit to recover damages for the death of her husband, Robert A. Linton, which she claims resulted from the negligence of the appellee, the Baltimore Manufacturing Company.

The deceased was in the employ of the appellant, and to maintain the action it was necessary for the appellee to allege and show that the appellant was negligent in the performance or non-performance of some duty it owed him, and that his death was the result of such negligence, without any negligence on his part, directly contributing thereto. So the declaration, which contains two counts, charges in the first count, as the negligence complained of, that the appellee did not furnish the deceased with a "safe and proper place in which to do and perform the work required of him, and did expose him to unnecessary risk or danger while so employed in that the defendant on or about the 18th day of November, 1906, assigned him to work in a room in their said plant where there was a large cistern or vat filled with boiling molasses, the mouth of which said cistern was flush or nearly so with the surface of the floor, and which was negligently left without guard rails or other proper protection;" so that the deceased, while in performance of his duties and being unable to see or locate the said cistern or vat by reason of the fact that said

room was filled with steam, without any want of care on his part, fell into said cistern or vat and received injuries from which he died. The second count is the same, except that it charges that the injury was sustained while the deceased was "in the performance of his duties about the premises," etc.

There are two exceptions in the record, one to the admission of certain evidence, and the other to the refusal of the Court to grant plaintiff's prayers and to the granting of defendant's first prayer, instructing the jury that the plaintiff had offered no evidence legally sufficient to show that the defendant had been guilty of any negligence in respect to any duty owing by it to the deceased, and that their verdict should be for the defendant.

The prayer does not refer to the pleadings, and hence in determining whether there was error in refusing to submit the case to the jury, we must examine the evidence without reference to the allegations of the narr., which however, we have set out as showing the theory on which the appellant claimed the right to recover.

The appellee is a corporation, and was engaged in the manufacture of vinegar, with its factory located in Baltimore City, on the corner of Madison and Van Buren Streets. That part of the factory building to which the evidence in this case refers, consists of a molasses room, vinegar room, boiler room, areaway, office, hallway, etc. The molasses room, where the injury occurred, is about forty feet long and about twenty-seven feet wide, and is located on Courtney and Falls Streets. On the Courtney Street side there were three large windows, and one window on the Falls Street side. The light through one of these windows was somewhat obstructed by a vinegar tank in the room, and there was a large molasses tank on the outside of the room which interfered with the light from one of the other windows. On the Courtney Street side there was a large door, and across the room, near the northwest corner, there were two steps leading up to another door opening into an areaway, from which you enter a hallway leading

to the office, boiler room, etc., and from which there is also a
door opening into the vinegar room. To the left of, and about
two and one-half feet from the steps, as you approach them
in the molasses room, and near the west wall of the room, is
the molasses vat, six feet in diameter and about three and
one-half feet deep, the top of which is described as being
flush with the floor of the molasses room; and to the right of
the steps, and near the north wall of the room, is a pump,
used to pump the molasses, after it is boiled in the vat, to
another part of the building. From the pump a two and one-
half inch pipe runs on top of the floor to the vat, a distance
of about four feet, so that in going to the steps from the mo-
lasses room, and after coming down the steps from the area-
way, you have to step over this pipe. The vat was used for
boiling molasses, and on the day of the accident there was no
railing around it. The molasses is heated by steam from a
steam pipe running from the boiler down into the vat. When
the steam is turned on it comes up through the molasses and
escapes in the room. It takes from ten to fifteen minutes to
boil the molasses, and as soon as it is boiled the steam is
turned off, the pump is started and the molasses is pumped
out of the vat. When you enter the molasses room through
the Courtney Street door there is nothing to obstruct the view
of the vat, except when the molasses is being boiled the steam
rises above the vat and escapes in and darkens the room
somewhat, particularly when the door and windows are closed,
as is generally the case on Sundays. Some of plaintiff's wit-
nesses go to the extent of saying that the room is sometimes
so dark that a cautious man has to feel his way by putting
his hands against the wall so as to make certain of avoiding
the vat, but even then you can see where the steam is coming
up out of the vat. Plaintiff's expert witness, Varney, says
that a sudden burst of live steam, which he distinguishes
from the ordinary condensed steam or vapor, has a bewilder-
ing effect upon a nervous man, not accustomed to it, and that
if a man was coming down the steps from the areaway to
the molasses room while the molasses is being boiled, in his

opinion, enough steam would come over him from the vat, "to affect him;" that if he was familiar with his surroundings and knew his place "a sudden gush of steam would not rattle him, but if he had no knowledge of his surroundings it most assuredly would."

The accident which caused the death of the deceased occurred on Sunday morning, between seven and eight o'clock. He had been working at the factory as a laborer for about two months, and worked there on one Sunday previous to the day of the accident, but he had never been assigned to any work in the molasses room, and his duties did not require him to go into that room, and on the morning of the accident his work was in the vinegar room. While there were a number of other entrances to the factory, the employees, without any notice from the company not to do so, in going out of and coming in that part of the factory, frequently went through the molasses room, as a shorter and a more convenient route, and the deceased was known to have gone that way at least five times, when they were not boiling molasses, and once when they were pumping molasses, and to have been at work at the Courtney Street door unloading molasses. The plaintiff did not produce an eye witness to the accident, but plaintiff's witness, Hartman, testified that he, witness, was sitting in the center office, and from this office you "pass through a hallway leading to the areaway from which you turn off to the right to go into the vinegar room and to the left to go into the molasses room," and that while sitting there the deceased came in on his way to the vinegar room, where his duties that morning required him to be, and talked to witness for a few minutes and then went out to go to the vinegar room. He did not say he was going to the vinegar room, but witness thought he was because witneess "knew he was there to work in the vinegar room." That about five minutes after he left the office he heard him cry out, and that witness went ou tand met him in the hallway; that he "was nude and covered with molasses, his skin crimped as though he had been burned;" that witness looked into the molasses room, the steam had

been turned off, and there was not as much steam in the molasses room as he had seen on previous Sundays, and that he didn't think that deceased had had time, after he left witness, to go out of the vinegar room and come in the Courtney Street door of the molasses room; that he "couldn't get through there on Sunday while cooking molasses" on account of steam, "couldn't see where he was going," "he would have to feel his way," and that he, witness, would not think of attempting it.

The only persons who were in the molasses room at the time and who saw the accident, are defendant's witnesses, Saunders and Powers, who worked in that room. Saunders was engaged in boiling the molasses, and Powers was looking on. They both state that there was very little steam in the room at the time "which rose above the vat;" that there was an electric light over the vat, and that there was nothing to obstruct the view of the vat from the Courtney Street door; that Saunders had finished boiling the molasses and had turned the steam off, and was about to start his pump when the Courtney Street door opened, and they turned around and saw the deceased coming in that door. Saunders says that after looking towards the door and seeing the deceased, he turned to start the pump and the next thing he heard was the splash, and he turned around and saw the deceased in the vat; that the deceased came in that door and walked across the room to the vat, a distance of twenty-nine feet, and that there was no reason why he could not have seen the vat. Powers states that he was looking right at the deceased, that he passed him, witness, and went to the edge of the vat ("witness not thinking that he was going into it"), and fell in on the Courtney Street side, and they helped him out on the other side.

It is apparent that these facts do not make out the case stated in the declaration, which charges as the negligence complained of, that the defendant failed to provide for the deceased a safe place in which to do the work for which he was employed, as plaintiff's evidence shows that the deceased

was not employed to work in the molasses room, and that none of his duties required him to go in there. This case does not, therefore, resemble the cases of *Winkelman & Brown Drug Co.* v. *Calladay,* 88 Md. 78; *Brager* v. *Austin,* 99 Md. 473, and *Am. Tobacco Co.* v. *Strickling,* 88 Md. 500, where the Court was dealing with the duty of employers to provide safe places and appliances for their servants while in the performance of the work for which they are employed.

But it is insisted that the defendant permitted without objection the employees in the factory to go through the molasses room in going in and out of the factory, and that they usually went out and came in that way, and that it therefore became its duty to make that route reasonably safe for them. One of the inferences to be drawn from this evidence is that the deceased, as one of the employees, so used the molasses room, in common with the other employees, and that he was, therefore, familiar with the room, knew of the vat, etc. But this is not left to inference, the uncontradicted evidence of defendant's witnesses being that he had passed through this room at least six times, and within three feet of the vat, when there was no steam from boiling molasses, and when, as he came down the two steps from the areaway, he could look right down into the vat, and it would be unreasonable to suppose that he did not see it, and that he worked at the Courtney Street door, where he had an unobstructed view of the room and the vat.

Assuming that the deceased in using this room in going in and out of the factory was not a licensee, the rule as stated in *Woods* v. *Heiges,* 83 Md. 268, is that "If a servant has knowledge of the circumstances under which the employer carries on his business and chooses to accept the employment, or continue in it, he assumes such risks incident to the discharge of his duties as are open or obvious. In such cases it is not a question whether the place prepared for him to occupy, and which he assents to accept, might, with reasonable care, have been made more safe. His assent dispenses with the performance on the part of the master of the duty to make it so."

And this Court in the case of *Gans Salvage Co.* v. *Byrnes,* 102 Md. on page 247, said that "One who remains in a service which necessarily exposes him to hazardous risks from causes open and obvious, the dangerous character of which he knew or had an opportunity of knowing, must be considered as having assumed such risks, and if injured in consequence thereof, has no claim against the employer." And in the case of *Linton Coal & Mining Co.* v. *Persons,* 43 N. E. Rep. 651, the Supreme Court of Indiana, speaking of the duty of a servant, quotes, with approval, from *Bailey, Mast. Liab.,* p. 162: "He must use reasonable care in examining his surroundings, to observe and take such knowledge of dangers as can be attained by observation. In performing the duties of his place, he is bound to take notice of the ordinary operation of familiar laws, and to govern himself accordingly. If he fails to do so, the risk is his own. He is bound to use his eyes to see that which is open and apparent to any person using his eyes; and if the defect is obvious, and suggestive of danger, knowledge on the part of the servant will be presumed, as well as when the dangers are the subject of common knowledge." *B. & P. R. R. Co.* v. *Abbott,* 75 Md. 152; *Eckhart* v. *Lazaretto Guano Co.,* 90 Md. 189; *Tkac* v. *Md. Steel Co.,* 101 Md. 179; *Feely* v. *Pearson Cordage Co.* (Mass.), 37 N. E. Rep. 368; 26 *Cyc.,* p. 1213, sec. 6.

This rule applies with much greater force to a servant whose duties do not subject him to the risk, but who voluntarily exposes himself to it in pursuit of his own convenience. *Tkac* v. *Md. Steel Co., supra;* 26 *Cyc.,* p. 1224, sec. 9.

Where, however, the risks to which a servant is exposed arise from causes hidden or secret, the master is bound to notify him of them, provided he himself knows, or by the exercise of ordinary care ought to have known of them (*Wood* v. *Heiges, supra*), and appellant contends that the risks to which the deceased was subjected by reason of the bewildering effect of live steam were not obvious but secret, and such as made it the duty of the defendant to warn him against them. The only evidence bearing upon this feature of the

case is that of plaintiff's witness, Varney, who, as we have said, states that a certain burst of live steam has a bewildering effect upon one not familair with its surroundings, and that if a person was coming down the steps from the areaway to the molasses room, when the steam was *turned on* and the molasses was being boiled in the vat, enough live steam would escape through the molasses and envelop him to rattle one *not familiar* with his surroundings. But if we assume that the deceased on the occasion of the accident entered the molasses room by way of the steps leading down from the areaway (of which, however, there was no evidence), the evidence of plaintiff's witness is that when he looked into the room immediately after the accident the steam was turned off, and that there was less steam in the room than usual on Sunday; while the evidence produced by the defendant shows that he entered the room from the Courtney Street door; that the steam had been turned off; that there was very little steam in the room; that an electric light was burning over the vat, and that there was nothing to obstruct his view of the vat. So that the conditions under which plaintiff's witness states that a person not familiar with his surroundings would be subjected to the hidden risks referred to, even assuming that the deceased did not know of the vat, etc., are not shown to have existed. Moreover, there is no evidence in the case to show that the defendant knew, or by the exercise of reasonable diligence could have known of the secret risks from exposure to live steam. The defendant's witnesses testified that they had worked in the room for years and had not discovered any such effect from it. *Am. Tobacco Co. Case, supra.*

Treating the case from another point of view, and assuming (as we must do, for there is no evidence in the case to show it, and the only evidence in the case is to the contrary), that the deceased had never been in the molasses room before, knew nothing of the conditions or of the existence of the unguarded vat; that he entered from the areaway when it was so dark in the room that it was necessary for one to feel his way by touching the wall, and when the conditions

were such, as stated by plaintiff's witness, Hartman, that he would not have thought of venturing in. Under such circumstances, and when, after two months' employment at the factory, he must at least have known that he was in the molasses room, and that there were probably in there dangerous appliances, to which he would be exposed and might encounter in the dark; when he was impelled not by any sense or call of duty, but by some plan or convenience of his own, upon what possible theory of right or justice could the plaintiff expect to recover?

Where one voluntarily acts in such entire disregard of his own safety, the unfortunate sufferers from his want of care and prudence can have no claim upon others to bear the consequences of his own negligence. This rule is so in harmony with a proper sense of justice, and has been so frequently recognized by this Court, that we will not refer to the many instances of its application, but will simply repeat what was said in *Balto. & Yorkt'n T. Rd.* v. *Leonhardt,* 66 Md. 70: "If indeed the conduct of the plaintiff below showed a reckless disregard of his safety, it was the duty of the Court to declare as matter of law, that it was such negligence as entitled the defendant to a verdict."

On the other hand, if we accept the evidence of the defendant as to how the accident occurred, already referred to, the deceased entered through the Courtney Street door and fell into the vat, the existence of which he must, or by the exercise of reasonable care ought to have known of, under circumstances of such gross negligence on his part, as disentitles the plaintiff to any claim against the defendant. *Meister* v. *Alber,* 85 Md. 72; *Reidel* v. *P., W. & B. R. Co.,* 87 Md. 153; *Paterson* v. *Hemenway,* 148 Mass. 94.

So, therefore, in no aspect of the case as presented by the evidence was the plaintiff entitled to recover, and where that is the case, it is the duty of the trial Court to take the case from the jury, *B. & O. R. R. Co.* v. *Belinski,* 106 Md. 452, and as we must affirm the ruling of the Court below in so doing, it becomes unnecessary to consider the other exceptions in the record. *Judgment affirmed with costs.*